[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 399 
On May 30, 1977, Dr. Farris Walker, a dentist in Auburn, Alabama, was reported missing. His automobile and some of his clothing were gone. Several small spots of blood splattered his bedroom and his bed had been stripped of all linen. Forty-five days later Dr. Walker's badly decomposed body was found partially concealed in a wooded area near Cook's Landing in Lee County, Alabama. Twenty-five year old Randy Jacks was indicted and convicted for the murder of the Auburn dentist. A jury fixed sentence at life imprisonment.
Only two issues are presented on appeal: (1) Whether Cash, the only eyewitness to the murder, was an accomplice and (2) if so, whether his testimony was corroborated and therefore sufficient to sustain the conviction.
In the Fall of 1974, Randy and Susie Jacks moved to Auburn where Randy attended college. They met Farris Walker, a dentist, and became friends. They even lived in his house for a couple of weeks. In July, 1975, Walker was divorced from his wife.
Fearing that his wife was having a romantic affair with Dr. Walker, Jacks separated from his wife in November of 1976. Randy and Susie Jacks obtained a divorce on the day of Walker's death.
Jacks made threats against Walker's life to his roommate, Billy Joe Sublett and Dale Parkman, Sublett's girlfriend. Jacks told Walker's ex-wife that he had thought about killing Walker but hadn't "for two reasons and those two reasons are your two children".
Jacks also discussed killing Dr. Walker with a friend, Gary Cash. Cash and Jacks discussed murdering Dr. Walker "40 or 50 or 60 times". Cash testified that
 "Whenever we would talk about killing Dr. Walker, it would be when Randy was depressed about the situation or whatever and it was, you might say, a way of relieving hostilities to psychologically cope with the situation."
To help "more or less settle him down", Cash would add to the conversations and actually thought up some ways to kill Walker. They discussed various methods of committing the murder; "just lots of ways, all of them stemmed around what we thought we could get our hands on and the opportunity at the time". They also discussed various methods of disposing of the body. Cash testified that he "really didn't want to kill Dr. Walker" and never thought that Jacks was going to actually carry out any of these threats.
Together Jacks and Cash would drive to the trailer where Susie was living to see if Walker's automobile was parked outside. They would also drive by Walker's home. *Page 400 
Although Cash testified that he never actually went on Walker's property or in his house before May 30, 1977, he stated that on some occasions they would stop and get out and Jacks would walk up to the house. On these occasions Jacks wore green Army fatigues.
 "Whenever he would go up to the house, he would carry numerous things, a knife, rope, and that sort of things."
* * * * * *
 "Gloves, screwdrivers, pair of pliers, some poison, some chloroform."
Cash stated that they never went to Walker's house to kill him on any occasion prior to May the 30th. Their purpose for going there was just to see who was there; "just because the car wasn't there didn't mean that Susie wasn't".
Around 3:30 on the Monday morning of May 30, 1977, Cash parked his pickup truck three blocks from Dr. Walker's house. Jacks had changed into his fatigues while Cash had been driving. Jacks also had his attache case where Cash knew he kept his .22 revolver with the homemade silencer and some tools.
Jacks, who had only been notified on Sunday afternoon that the hearing on his divorce was set for Monday morning, told Cash that "he was going to Court the next day and he wanted to go in and to see if Susie was there in the house". Jacks did not tell Cash that he intended to kill Walker and Cash testified that he did not know that Jacks was carrying the revolver.
Once at the house, Jacks disconnected the telephone lines. Jacks then took off his shoes and put on a pair of rubber surgical gloves. With Cash's assistance, he climbed through a kitchen window. Cash then went to each side of the house to see if any lights had come on in the neighboring houses.
Jacks opened a side door and motioned for Cash to enter. Cash testified that he did not know why he entered the house; "My better judgment told me not to but I don't know". Jacks warned Cash about a step that squeaked on the stairs.
Jacks started up the stairs and Cash followed. When Cash arrived at the top of the stairs Jacks was at the foot of Walker's bed. Cash stopped in the doorway. Jacks took a step or two and Cash saw a shadow rise up in the bed and state, "Randy, are you crazy?" Cash then heard a gunshot and saw the muzzle flash. Only later did he see the .22 equipped with a silencer.
After being shot, Walker mumbled and fell back in bed. Jacks immediately jumped on top of Walker and a slight struggle ensued. Jacks then "backed off" the bed and turned on a bedside lamp. Walker was lying on his back with a disposable diaper stuck in his mouth. Jacks took some bloody pillows and put them in the middle of the bed. He grabbed some of the bedclothing and pulled Walker off the foot of the bed positioning Walker so that he was sitting on the floor with his head leaning forward. Cash still had not moved from the doorway or said anything. He testified that "it happened so fast and it was like a nightmare — it's something that's hard to really grasp and I was just petrified".
Jacks took a piece of white ski rope and strangled Walker. Cash then walked into the room and helped Jacks clean up. Cash stated that he did this because "it was nothing else for me to do. I was there. I was an accessory." Cash stated that they had not discussed the particular method by which Walker was actually killed and that prior to the time the gun was fired he did not know that Jacks was going to kill Walker.
Together they cleaned up the bedroom and carried Walker's body downstairs and placed it in Dr. Walker's Fiat automobile which was parked under the carport. Cash then went to his truck and Jacks drove the Fiat toward Phenix City. Before they reached Phenix City they transferred the body and the bloody bed linen and the fatigues that Jacks had been wearing into the back of Cash's pickup truck which had a camper shell. Jacks then drove to Phenix City and left the Fiat in the parking lot of a Holiday Inn. Cash followed and picked him up. *Page 401 
The pair drove toward Lake Harding and disposed of the body near Cook's Landing. The pistol was thrown into the lake by Jacks. They returned to Cash's trailer around 9:00 that morning and Jacks went to class. Cash then drove down the highway and placed the three plastic trash bags containing the bed linen and clothes in separate dumpsters.
On Wednesday, two days after the murder, Cash and Jacks were interviewed by the Auburn Police Department. Previously the two men had made up a story to account for their time. Seven weeks after the murder Cash began to relate parts of the crime to the police. Cash never revealed the entire truth of the murder until after he was granted immunity from prosecution though that immunity was conditioned on Cash telling the whole and complete truth. Eventually Cash led the police to Walker's body. The next day Jacks was arrested for the murder of Dr. Walker.
In a voluntary statement given to Detective Roy Plant of the Auburn Police Department before he was arrested Jacks admitted being with Cash from 2:00 until 8:00 on the morning of May 30th. He maintained that he and Cash stopped at the Ridgewood Trailer Park in Auburn and talked for about an hour. When they were ready to leave the truck would not start so they sat and talked from 4:00 A.M. until 8:00 A.M., when they were able to "crank" the truck and return to Cash's trailer.
Detective Lieutenant Ted Murphy took charge of the investigation into Walker's disappearance. After Cash showed Murphy the location of Walker's body, a warrant was issued for Jacks' arrest. On July 15, 1977, Randy Jacks was arrested in Birmingham, Alabama, for the murder of Dr. Walker. On the trip back to Auburn Jacks was advised of his constitutional rights and voluntarily waived them. Detective Murphy said, "Randy, you don't appear in any way to be sorry that you killed Walker". Jacks responded, "I am sorry the man is dead. I'm glad you found the body for the sake of the family." Jacks also stated that he knew they would come after him if they ever found the body.
At the Auburn Police Department, Jacks was again advised of his constitutional rights and signed a waiver of rights form. Though he would not make a statement, he requested pencils and paper, stating that he would give a statement later as to what happened in Walker's home on the morning of May 30th. Jacks stated that he needed to go to sleep and needed time to collect his thoughts. The interview was ended and Jacks was taken to his cell.
That afternoon Jacks was taken to Murphy's office. He was again advised of his rights and again signed a waiver of rights form. Detective Murphy testified that Jacks then told him that
 "I want you to understand I never went to that house with intention of killing Dr. Walker. I will give you a statement as to what happened in Walker's bedroom that night and when I tell you, it will seem so unreal, you won't believe it; but I have to get it straight in my own head first and if you will give me some more paper or some paper and pens, I could write it all out in my cell."
Though Jacks never gave a statement he never denied killing Walker. The voluntariness and admissibility of his remarks to the officers of the Auburn Police Department are not challenged on appeal. However we have determined that they were properly admitted into evidence.
At trial Jacks testified in his own behalf and denied murdering Walker and stated that he told Detective Murphy that he would write out a statement so Murphy would allow him to get some sleep.
 I
The classic and usual test to determine whether a witness is an accomplice is whether he could be indicted and convicted for the particular offense, either as principal or accessory.Miller v. State, 290 Ala. 248, 275 So.2d 675 (1973); Doss v.State, 220 Ala. 30, 123 So. 231 (1929); Ash v. State, 81 Ala. 76,1 So. 558 (1887). An accomplice is defined as "`an associate in crime; a partner *Page 402 
or partaker in guilt'". Darden v. State, 12 Ala. App. 165, 167,68 So. 550, 551 (1915).
Parties are responsible as accomplices for consequent acts growing out of a general design, but they are not for independent acts growing out of the particular malice of individuals. Alston v. State, 109 Ala. 51, 55, 20 So. 81
(1896); Pierson v. State, 99 Ala. 148, 152, 13 So. 550 (1892).
 "And this criminal accountability extends, not alone to the enterprise, adventure, or encounter in which the conspirators are engaged, but it takes in the proximate, natural, and logical consequences of such adventure. This, because all men are presumed to intend the proximate, natural, and logical consequences of acts intentionally done; and one who is present, encouraging or ready to aid another in such conditions, must be presumed to be cognizant of that other's intention, to the extent above expressed. If such conspiracy, or community of purpose, embrace the contingency that a deadly encounter may ensue, with the common intention, express or implied, to encourage, aid, or assist, even to the taking of life, should the exigencies of the encounter lead up to that result; then, as a general rule, the act of one becomes the act of all, and the one who encourages, or stands ready to assist, is alike guilty with the one who perpetrates the violence. And such community of purpose, or conspiracy, need not be proved by positive testimony. It rarely is proved. The jury are to determine whether it exists, and the extent of it, from the conduct of the parties, and all the testimony in the cause."
* * * * * *
 "We have said the accomplice, equally with the actor, is responsible for the acts done, if they are the proximate, natural, and logical result of the adventure upon which they enter with common purpose. This needs some explanation. The accomplice, as we have seen, is criminally responsible for acts which are the direct, proximate, natural result of the conspiracy formed. He is not responsible for any special act, not within the scope of the common purpose, but which grows out of the individual malice of the perpetrator. 1 Wharton Crim. Law, § 397. "A further explanation: Many public offenses consist of an act done, coupled with a constituent element which extends beyond the act, and takes in something outside of it. Knowledge and intent, when constituents of crime, are of this class. When knowledge is one of the required elements, then the accomplice must have knowledge, or he is not guilty. Buying or receiving stolen goods, knowing them to be stolen, furnishes an illustration of this principle. So, when intent is one of the required constituent elements, the co-conspirator, or accomplice, to authorize his conviction, must himself have entertained the intent, or must have known that the actor, whom he was encouraging, aiding, or abetting, entertained it. Without this individual intent, or personal knowledge, it can not be affirmed that he aided or abetted in the crime charged. This need not, however, be positively proved. If it fall within the scope of the common purpose, formed and entered into, it is enough."
 Tanner v. State, 92 Ala. 1, 6, 7, 9 So. 613, 615
(1890).
See also Howell v. State, Ala.Cr.App., 339 So.2d 138 (1976). For this reason, the mere presence of a witness at the scene of a homicide, without more, is insufficient to show the witness's complicity in the crime. Jones v. State, 174 Ala. 53, 57 So. 31
(1911); Taylor v. State, 49 Ala. App. 433, 272 So.2d 905 (1973);Leonard v. State, 43 Ala. App. 454, 192 So.2d 461 (1966).
In Ladd v. State, 39 Ala. App. 172, 98 So.2d 56 (1957), the statement was made that a participant in an illegal venture for one purpose becomes one for all and the court will look at him as a "derivative accomplice" so far as requiring corroborative evidence is concerned. This principle must be limited and applied in light of the rules set forth above. Thus a participant in an illegal venture for one purpose becomes one for all where the additional crimes are the *Page 403 
proximate, natural, and logical result of the adventure upon which the actors engaged with a common purpose.
Except where the state's evidence undisputedly makes the witness an accomplice, the defendant has the burden of showing the witness's complicity. Fairbanks v. State, 46 Ala. App. 236,239 So.2d 908 (1970); Moore v. State, 15 Ala. App. 152,72 So. 596 (1916).
Whether a witness is an accomplice may be a question of law or fact, depending on the circumstances. Doss v. State,220 Ala. 30, 123 So. 231 (1929). However the question of complicity is usually a question of fact; it becomes a question of law only where the court is clearly convinced by a preponderance of the evidence that the witness could have been indicted and convicted of the same charge of a felony for which the defendant is on trial and that the witness freely participated in the crime. Where there is no conflict in the testimony, the question of whether a witness is an accomplice is a question of law for determination by the trial court. Pryor v. State,47 Ala. App. 706, 260 So.2d 614 (1972).
 "The question of law for the court resolves itself into one of undisputed evidence. If this, taken altogether most favorably toward the noncomplicity of the witness, still leaves unchallenged acts which would support a verdict of guilt of the witness, then the court, if requested, must require the State to adduce corroboration."
Leonard, supra, 43 Ala. App. 464, 192 So.2d 469.
Thus where there is doubt or dispute whether a witness is in fact an accomplice, the question is for the jury and not the trial court. Skumro v. State, 234 Ala. 4, 170 So. 776 (1936). Where there is doubt whether a witness is in fact an accomplice, and the testimony is susceptible to different inferences on that point, that question is for the jury.Sweeney v. State, 25 Ala. App. 220, 143 So. 586 (1932); Horn v.State, 15 Ala. App. 213, 2 So. 768 (1916).
Daniels v. State, 50 Ala. App. 88, 277 So.2d 364 (1973), involved a prosecution for robbery. The state's chief witness against the defendant had also been indicted for the robbery.
 "The fact that Bailey was jointly indicted with the appellant will not per se raise a presumption that he was an accomplice. * * * According to Bailey's testimony he was unaware that appellant and the others were intending to commit a robbery. Whether this testimony was believable was for the jury. This issue was properly submitted to the jury via given written requested charges and decided adversely to appellant."
Daniels, 50 Ala. App. 91, 92, 277 So.2d 367.
This is in accord with the general rule.
 "If a witness admits his participation with the defendant in the crime but seeks by his testimony to explain it and to show his innocent intent, it has been held that a question is presented for the jury." 19 A.L.R.2d 1352, 1381 (1951).
White v. State, 352 So.2d 29 (Ala.Cr.App. 1977), also involved a prosecution for robbery. This court held that, although it was difficult to reconcile the witness's statement that he and the defendant were driving around trying to find someone to rob and his other testimony to the effect that immediately on observing the actions of the others (i.e., picking up a stick and a pipe and stating that they were "going to get them") he left the scene, the witness was not an accomplice absent any showing that he said or did anything in the way of encouragement or assistance. Therefore his testimony was not required to be corroborated before it could be used to convict the defendant of robbery.
Most recently, the Alabama Supreme Court addressed this question and held that, where a witness denies his participation in the crime charged against the defendant, the issue of his being an accomplice is a disputed fact presenting a question for the jury despite the additional fact that the witness had previously been convicted for the identical crime for which the defendant is on trial. Yarber v. State, Ala., *Page 404 
___ So.2d ___ (1978). The court distinguished Yarber from Childs v.State, 43 Ala. App. 529, 194 So.2d 861 (1966) on the basis that in Childs the accomplice-witness admitted his participation in the crime for which both he and the defendant were indicted.
Where the issue of whether the state's witness was an accomplice is for the jury, the denial of the accused's motion to exclude the state's evidence for insufficient corroboration is not error. Perry v. State, 340 So.2d 895 (Ala.Cr.App.), cert. denied, Ex parte Perry, 340 So.2d 896 (Ala. 1976); Welchv. State, 35 Ala. App. 643, 51 So.2d 905 (1951).
Cash admitted his participation in the breaking and entering into Dr. Walker's house. However he positively denied any knowledge that Jacks intended to kill Walker that night or that Jacks was armed with a pistol. Though present at the scene, Cash denied any participation in the murder or any prior knowledge of Jacks's intent. Jacks also denied that he went to Walker's house with the intention of committing murder. Though Cash assisted Jacks in disposing of the evidence of the crime, the testimony of an accessory after the fact does not require corroboration. Cooper v. State, 43 Ala. App. 385, 191 So.2d 224
(1966).
From the testimony given at trial and Cash's denial of any participation in and prior knowledge of the murder, the question of his complicity in the murder was one for the jury. While there is evidence to show that Cash might have been an accomplice, we cannot define him as such as a matter of law.Yarber, supra. Therefore the trial court's refusal to exclude the state's evidence was not error. Perry, supra; Welch, supra.
 II
Nevertheless, even assuming that Cash was an accomplice, the facts in this case convince us that there was sufficient corroboration of his testimony.
While Section 12-21-222, Code of Alabama 1975, prohibits the conviction of a felony on the uncorroborated testimony of an accomplice, both circumstantial and direct evidence are competent to connect the defendant independently with the crime about which the accomplice has testified. Blevins v. State,56 Ala. App. 115, 319 So.2d 734, cert. denied, 294 Ala. 753,319 So.2d 739 (1975); Goodman v. State, 52 Ala. App. 265,291 So.2d 358 (1974); Pryor v. State, 47 Ala. App. 706, 260 So.2d 614
(1972).
The corroborative evidence need not refer to particular statements testified to by the accomplice. Skumro v. State,234 Ala. 4, 170 So. 776 (1936); Malachi v. State, 89 Ala. 134,8 So. 104 (1889).
 "It is not necessary that the corroborating evidence refer to any particular statement or fact testified to by the accomplice. If it strengthens the probative criminating force of his testimony and tends to connect the defendant with the commission of the offense it is sufficient to warrant the submission of the issue of guilt or innocence to the jury." Smith v. State, 230 Ala. 413, 416, 161 So. 538, 542 (1935).
The evidence corroborating the testimony of an accomplice need not be strong, nor sufficient in and of itself to support a conviction. Its sufficiency is tested by whether it legitimately tends to connect the accused with the offense.Currington v. State, 342 So.2d 390 (Ala.Cr.App.), cert. denied,342 So.2d 393 (Ala. 1976) and cases cited at 342 So.2d 392.
 "The corroboration necessary to support the testimony of an accomplice must be of some fact tending to prove the guilt of the accused. It is not sufficient if it is equivocal or uncertain in character and must be such that legitimately tends to connect the defendant with the crime. It must be of a substantive character, must be inconsistent with the innocence of the accused and must do more than raise a suspicion of guilt."
 Sorrell v. State, 249 Ala. 292, 293, 31 So.2d 82, 83
(1947).
See also Kimmons v. State, 343 So.2d 542 (Ala.Cr.App. 1977). *Page 405 
A voluntary confession by the accused may constitute sufficient corroboration of an accomplice to authorize a conviction. Snoddy v. State, 75 Ala. 23 (1883); Williams v.State, 52 Ala. App. 406, 293 So.2d 324 (1974). However evidence of motive alone is not sufficient corroboration, Sorrell v.State, 249 Ala. 292, 31 So.2d 82 (1947); Brown v. State,31 Ala. App. 529, 19 So.2d 88 (1944), although it may be considered in connection with other evidence tending to connect accused with the crime. Slayton v. State, 27 Ala. App. 422, 173 So. 632, reversed on other grounds, 234 Ala. 1, 173 So. 642 (1937). Threats against the deceased made by the accomplice have been considered corroborative of the testimony of the accomplice.Bonner v. State, 107 Ala. 97, 18 So. 226 (1894).
 "Thus, evidence showing the existence of malice or ill-will on the part of accused toward the victim of the crime has been considered corroborative of the testimony of an accomplice, especially where such malice has been manifested by threats to commit an act such as that for which accused is on trial; but it has been held that a mere showing of ill-will toward the victim, or of a threat, is not sufficient corroboration." 23 C.J.S. Criminal Law § 812 (4)a.
Additionally, sufficient corroboration of the testimony of an accomplice may be furnished by a tacit admission by the accused, by the suspicious conduct of the accused, and the association of the accused with the accomplice, or by the defendant's proximity and opportunity to commit the crime.Cheatwood v. State, 22 Ala. App. 165, 113 So. 482, cert. denied,216 Ala. 692, 113 So. 915 (1927); 23 C.J.S. Criminal Law § 812 (4).
"In determining the sufficiency of corroborative evidence testimony the entire conduct of an accused within reasonable time limits of the date of the offense may be examined." Fullerv. State, 34 Ala. App. 211, 215, 39 So.2d 24, 27, 252 Ala. 20,39 So.2d 29 (1949). An accused's consciousness of guilt as shown by the evidence may be corroborative. Fuller, 34 Ala. App. 215, 39 So.2d 24.
Applying these principles to the facts before us we have no difficulty in finding that the incriminating testimony of Cash, even if he be considered an accomplice, was sufficiently corroborated. Jacks made threats on Dr. Walker's life to a number of people. He asked Sublett if he would back up his statement in case anything happened to Dr. Walker. Cash, Sublett, and Parkman all testified to the various methods and schemes Jacks had devised for murdering Dr. Walker. Sublett and Cash had ridden with Jacks in checking Dr. Walker's home to see if Susie Jacks was there. Dale Parkman testified that Jacks told her that he had gone to Walker's house and entered it through a window in the back, intending to shoot Walker. In a voluntary statement, Jacks admitted that he had been with Cash on the morning of May 30th from 2:00 A.M. till 8:00 A.M.
Though accused, Jacks never denied murdering Dr. Walker. Detective Murphy accused him but Jacks only responded, "I am sorry the man is dead. I'm glad you found the body for the sake of the family." Jacks also testified that he knew they would come after him if they ever found the body. Jacks told Detective Murphy that he would give a statement as to what happened in Walker's home on the morning of May 30th and requested pencils and paper. Jacks told Murphy that
 "I want you to understand, I never went to that house with intention of killing Dr. Walker. I will give you a statement as to what happened in Walker's bedroom that night and when I tell you, it will seem so unreal, you won't believe it; but I have to get it straight in my head first and if you will give me some more paper or some paper and pens, I could write it all out in my cell."
Jacks had a motive for and the opportunity to commit the murder. He threatened Dr. Walker's life and planned his murder. His statements to the police indicate a consciousness of guilt and his conduct arouses suspicion. All of these factors together are sufficient to connect Jacks to the crime and corroborate Cash's testimony. *Page 406 
 III
Though the issues of whether Cash was an accomplice and, if so, whether there was sufficient corroboration were for the jury, the trial judge did not instruct the jury on accomplices or their testimony. The record contains no written charge and apparently no instruction was requested on this subject. At the close of the court's oral charge defense counsel announced "satisfied". The partial or total failure to instruct in oral charge with reference to the principles of law that are involved in the trial of a criminal case cannot serve as a basis for a reviewable question on appeal where no objection was made to that oral charge and no requested written instructions were refused. McPherson v. State, 198 Ala. 5,73 So. 387 (1916); Ingram v. State, 48 Ala. App. 193,263 So.2d 179, cert. denied, 288 Ala. 743, 263 So.2d 181 (1972).
We have thoroughly searched this record on appeal and found no errors affecting the rights of the appellant. Therefore the judgment of the trial court is due to be affirmed.
AFFIRMED.
All Judges concur.