Receiving embezzled property; ten years.
Appellant was found guilty of receiving embezzled property under Counts III, IV and V of a five-count indictment returned by the November, 1979 Term of the Montgomery County Grand Jury. Appellant was found not guilty of embezzlement under Count I of the indictment and the trial court sustained appellant's demurrer to Count II, eliminating that count from the jury's consideration.
Counts III — V of the indictment charge that appellant:
 ". . . did feloniously receive money, checks, bank notes, bills of exchange or other evidence of debt, the property of Associates Financial Services Company of Alabama, Inc., a corporation [in the amounts of $43,629.98, $33,629.98, and $27,834.43, respectively,] knowing that said money, checks bank notes or bills of exchange had been embezzled, fraudulenty converted or fraudulently secreted with intent to prevent the recovery thereof to defraud the rightful owner."
 I
Appellant contends that the indictment under which he was charged is void because no legal evidence was presented to the November, 1979 Montgomery County Grand Jury. While it is clear that a grand jury may not indict merely on their own suspicions and must have sworn witnesses or self-proving documents before them, State ex rel. Baxley v. Strawbridge, 52 Ala. App. 685,296 So.2d 779, cert. denied, 292 Ala. 506, 296 So.2d 784 (1974); Ala. Code § 12-16-200 (1975), it is also clear that the State is not required to prove the sufficiency of any such documentary evidence or testimony. Fikes v. State, 263 Ala. 89,81 So.2d 303 (1955), rev'd on other grounds, 352 U.S. 191, 77 S.Ct. 281,1 L.Ed.2d 246 (1957).
In response to appellant's motion to dismiss or, in the alternative, to quash the indictment on December 6, 1979, the trial court, on February 27, 1980, ordered the State to produce evidence that the November 27, 1979 Term of the Montgomery County Grand Jury had before it either documentary evidence or the testimony of a witness at the time it returned a true bill on appellant's indictment. Then, at the beginning of appellant's trial before opening statements, the trial court entered the following stipulation into the record:
 "COURT: Stipulating the witness for the State who testified before the Grand Jury is Mr. Macon Brock and he was the sole witness. He was the only witness *Page 1326 
and he was represented by the law firm of Jordan and Heard."
No objections were made to this stipulation.
On the third day of trial, March 26, 1980, the appellant called Macon Brock as his first witness; Mr. Brock had previously testified as a State witness. During his direct examination by appellant the following exchanges occurred:
 "Q. You have testified as a witness for the State before the grand jury, haven't you?
"A. Yes, sir, that's correct.
 "Q. I don't want you to give me your exact answer unless you know it, but in your best judgment how many times have you appeared before the grand jury?
"A. That's easy, just one.
"Q. Just one time?
"A. To the best of my knowledge, yes, sir.
"Q. That was in the James Wright case?
"A. Yes, sir.
. . . .
 "Q. Alright, sir. You recall when you testified before the Grand Jury; you only testified once?
 "A. To the best of my memory it was last summer or fall.
"Q. Summer or fall, you don't know which?
 "A. It could have been in the last — it could have been in the winter, it could have been in the last four or five months.
 "Q. Mr. Brock, you haven't testified but before one Grand Jury and in one case. Just give us —
"MR. BEERS: Your Honor —
 "A. Mr. Whitesell, that wasn't the biggest day of my life.
 "MR. BEERS: Mr. Brock. We object at this time. He has testified here today but he did testify before the Grand Jury against this man and that is all he is required to do. We object to any further questioning on this matter. Mr. Whitesell knows it is not proper.
. . . .
 "Q. Alright. You recall whether you testified in July of last year before the Grand Jury?
 "A. I don't remember the day I testified before the Grand Jury. I know I testified. I have already said that but I do not remember the date.
 "Q. I'm not asking you for the date. I am asking you if it was in the month of July.
 "MR. BEERS: Objection, Your Honor. He has answered that question to the best of his ability. I don't know whether Mr. Whitesell is trying to trap him into something that he has answered that question.
"THE COURT: Overruled.
"Q. Did you testify in July, Mr. Brock, of 1979?
"A. It could have been, I just don't remember.
 "Q. Do you have any memory at all about the season of the year?
"A. Yes, sir.
"Q. Well, was it summer time?
 "A. I wasn't connecting the season to the date. I testified before the Grand Jury, Mr. Whitesell. To tell you the truth, it was about the most unpleasant experience I have ever had and I want to never have it again and I didn't pay any attention to the date.
 "Q. Yes, sir. I do understand that fully, Mr. Brock but it's important not just to you but to everybody in the case, that you do exercise the best memory you can as to whether it was July or November.
 "A. To the best of my memory, I think it might have been July but I am not positive."
The controversy over whether Mr. Brock had testified at the July Term or the November Term of the Montgomery County Grand Jury arose because of an earlier indictment which had been presented to the July Term of the grand jury charging appellant with receiving embezzled property.[1] *Page 1327 
Appellant claims that Mr. Brock testified at the July Term of the grand jury and that, according to the trial court's stipulation and Mr. Brock's statement that he testified only once before the grand jury, no legal evidence was presented to the November Term. In his motion for a new trial or, in the alternative, for a judgment of acquittal, appellant insists that Brock did not testify before the November Term. Appellant argues now on appeal that the trial court's stipulation concerning Brock's testimony before the grand jury was in error due to "the falsity of the representations" by the State.
In a motion to quash an indictment alleging failure by the State to present legal evidence to the grand jury, the burden of proof is on the defendant. Sparks v. State, 46 Ala. App. 357,242 So.2d 403, cert. denied, 286 Ala. 738, 242 So.2d 408
(1970), cert. denied, 402 U.S. 909, 91 S.Ct. 1382,28 L.Ed.2d 650 (1971); Hill v. State, 20 Ala. App. 197, 101 So. 298 (1924). From the record before us appellant failed to carry his burden of proof. An appellate court may only consider matters contained in the record as it is filed on appeal. Lucy v.State, 340 So.2d 840 (Ala.Cr.App.), cert. denied, 340 So.2d 847
(Ala. 1976).
At most, Brock's testimony that he could not remember whether he testified at the July Term or November Term of the grand jury was inconclusive. Contrary to appellant's allegations, Brock did not deny that he had testified before the November Term, nor did he state with any certainty that he had testified before the July Term. He did remember testifying, and to testifying only one time before the grand jury. Appellant offered no other evidence, besides Brock's testimony, to show that the November Term of the grand jury did not have legal evidence before them at the time the indictment was returned in this cause. This proof, or lack of proof, offered by appellant falls short of contradicting the stipulation entered by the trial court.
The testimony of a single witness before the grand jury is sufficient to comply with Ala. Code § 12-16-200 (1975). Douglasv. State, 42 Ala. App. 314, 163 So.2d 477 (1963), cert. denied,276 Ala. 703, 163 So.2d 496 (1964), rev'd on other grounds,380 U.S. 415, 85 S.Ct. 1074, 13 L.Ed.2d 934 (1965). When it appears that witnesses were examined by the grand jury, or the jury had before them legal documentary evidence, no inquiry into the sufficiency of the evidence is indulged. Fikes, supra;Sparrenberger v. State, 53 Ala. 481 (1875); Evans v. State,338 So.2d 1033 (Ala.Cr.App. 1976), cert. denied, 348 So.2d 784
(Ala. 1977).
 II
Appellant next questions the sufficiency of the State's evidence. In deciding whether the trial court properly overruled appellant's motion to exclude this court is required to view the evidence in the light most favorable to the State.Livingston v. State, 44 Ala. App. 559, 216 So.2d 731 (1968).
Macon A. Brock, Sr., a key witness for the State, testified that he had been employed at Associates Financial Services of Alabama for approximately sixteen and one-half years prior to October 23, 1978, the date he left the company. Associates Financial Services had formerly been Cumberland Capital and Brock had opened the Madison Avenue branch of that lending institution in Montgomery as branch manager and employee supervisor in 1971.
The witness had known appellant since 1972 or 1973, when appellant first inquired about obtaining a loan. Appellant had been referred to Brock by a representative of Central Bank. Around the time appellant and his second meeting with him, Brock became aware that appellant was a bookmaker "which presented a problem of me making a loan." The loan was made, however, and shortly thereafter Mr. Brock began placing bets with appellant on football games. Brock said, "I would bet one or two a week right to start or more." He would then have weekly meetings with appellant to discuss the bets. Those meetings were at *Page 1328 
first unrelated to any business transactions appellant had with Associates Financial Services. He testified that it was the next fall before he (Brock) had a "close" gambling relationship with appellant. Brock continued to place weekly bets with appellant during football season, "but from time to time I did let Mr. Wright borrow money too."
Brock stated that he "lost a lot more that [he] won" during that second fall and began to borrow money to pay his gambling debts. He borrowed from other companies, banks, personal friends and "anyway [he] could get it." He also began betting with other bookies besides appellant. Brock testified that at the conclusion of the 1974 football season he had lost so much from gambling that he had to sell his house to pay a portion what he owed to the various bookies, including appellant. Brock made payments to appellant out of the proceeds from the sale of his house in the spring of 1975. He stated that the total of his gambling debts at that time was approximately $15,000.
Brock continued to gamble with appellant and others after selling his house and he continued to lose. He stated that on one occasion he lost approximately $2,500 to appellant that he could not pay. At this point appellant suggested that a friend of his could take out a loan with Associates Financial Services, pay him (appellant) the money and that Brock could make the payments on the loan. Brock testified that he was opposed to this idea and said "after we talked a couple of other times he (appellant) asked could he get it in his name and me make the payments." The witness stated that he made the type "loan" suggested by appellant in the Fall of 1975 or Spring of 1976.
The witness admitted that he continued to gamble and to lose money to appellant after this "loan" transaction and that appellant continued to come to him to get similar loans. Brock could not recall the exact number of these loans that he made to appellant between 1976 and March of 1978. He explained to appellant that he could not put "bookmaker" on any of the loan documents or show "the exact cause that he was getting the money." He further explained to appellant that he could not put all the loans in appellant's name, that the home office of Associates Financial Services would detect the loan transactions by computer and know it was above his loan limit of $10,000. Thereafter, appellant began to receive loans from Brock in other names. Brock continued to lose to appellant and to others as well during this period. From time to time, Brock also refinanced some of appellant's "loans."
Brock specifically remembered a loan transaction involving approximately $43,000, the subject of this cause, which he discussed with appellant and one Jimmy Burgess, another gambling creditor, on March 6, 1978. In addition, appellant had taken out a loan in the name of Joe Hood, Burgess' uncle. Brock detailed the discussion he had with appellant concerning the $43,000 loan as follows:
 "A. To the best of my knowledge, the conversation went as such, there's a number of accounts in several people's names. It was several in Mr. Wright's name and I explained that we had to do something in order to get them combined, where they wouldn't be as readily examined or audited.
 "In order to explain this in detail, where it would sound sensible, you would have to know a little bit about computers and about the way the operation worked. Any time a loan was made you had printouts in the original home office and the home office. And any payments that was made or loans that were made, they had tapes just like we had in the branch. If they noticed, if they happened to be looking for or if they noticed more than one or two transactions to any one individual, they could easily check and see what the amounts of the other loans were or was. And also if they exceeded my credit limit. So, — (interrupted)
"Q. What was your credit limit at that time?
"A. Ten thousand dollars.
"Q. Okay, sir. Continue. *Page 1329 
 "A. I explained if we didn't get them combined that sooner or later the auditors were going to come in and discover where I had been lending money to him. Of course, some of it was lent to him strictly for personal reasons. And then some of it was lent to him that I had lost, that I was to pay back myself.
 "Once they discovered this, of course, I knew, it was my job, possibly my family and possibly any future I might have had at that time. And I also knew and he knew that it would get him in trouble at the same time.
 "Due to me owing him money, him owing the company money, Burgess owing the company money, he owing Burgess money, and Burgess owing him money, it was just like a — it was one reason it was very hard to keep up with every transaction. "But I explained at this time that in order to get enough or a greater enough amount of money to do any good, to combine several of these loans, it would have to be on real estate. I knew that eventually I would have to get approval on it, from Nashville, Tennessee which is the original home office at that time. "I explained that it would have to be on property and that they should buy or try to find as cheap a property as possible, unimproved property, acreage. And to buy it at a cheap enough price where we could pay part of it, in order to pay part of it first of all to get title of it. And then the way the rest of it would go to combine accounts that was already in their names.
 "After explaining all this it was decided on at that time, that they would try to find some property in order for us to do this.
 "Q. Why did you explain to them that they needed to find some real estate property?
 "A. Because I knew by making a loan of that size that I had to get approval on it and I knew that in getting that type of approval, even with lying, and inflating the value of it, and saying anything I could possibly say, that it had to be on real estate."
Brock testified that appellant and Jimmy Burgess later reported that they had located a suitable forty-acre tract of property in Elmore County for $20,000. Appellant's one-half of this tract was twenty acres and its purchase price was $10,000. This twenty-acre tract was to be used as collateral for the $43,000 loan to appellant. Brock explained to appellant and Jimmy Burgess that there was no way he could show a $10,000 or $20,000 purchase price for a $43,000 loan. To comply with the percentages Associates Financial Services would allow for a loan on unimproved real estate, Brock said that it was necessary to state an appraised value of $66,000 on the loan documents for the twenty acres to make a $43,000 loan. The necessary false representations and falsified documents were made at Brock's direction. Appellant was completely aware of these procedures. Brock stressed the importance of getting as many of appellant's prior loans combined as possible and of paying them off out of the $43,000 transaction. "[W]e knew that we had to get the ones together that would come nearer hiding the number of loans that was made."
Brock testified that he was familiar with the loans, the amounts on the checks and the number of accounts involved in the $43,000 loan transaction. Brock stated that the $43,000 figure:
 "[W]as the most money that I felt that we could possibly get by with making. And the very most that we could show a loan for in order to combine the accounts and not be called or questioned."
Brock next testified that four checks, State Exhibits 3-6, were issued from the $43,000 transaction and were made payable as follows:
 "This first one is a check to James C. Wright and Mary Wright and Tidmore-Adams Realty, for $10,000. It was the check that went to the purchase of the property.
 "The next check was $27,834.43 made to James C. Wright and Mary Wright. And it was the check that was made to them *Page 1330 
in order to combine five different accounts and make payments on two or three.
. . . .
 "The next one is in the amount of $5,795.55, made to James C. Wright and Mary Wright and Associates Financial Services Company of Alabama, Inc. And that's was just another one of their accounts that was paid off by the loan.
. . . .
 "The next check is to James C. Wright and Mary Wright for $192.12. And the best I recall it was for insurance. . . ."
Brock testified that misrepresentations were made on all of appellant's loan documents, including those on which he (Brock) was to make the payments, as well as on those which were personal loans to appellant. The misrepresentations were fully discussed with appellant. Brock concluded his direct examination by admitting that he had pleaded guilty to embezzlement from Associates Financial Services.
John D. Boyd, senior vice-president of Associates Financial Services, testified that he came to Montgomery from Dallas, Texas on October 31, 1978 to investigate a number of multiple accounts at the Madison Avenue branch. Boyd stated that his audit of that branch revealed forgeries, misrepresentations, fictitious loans, multiple loans, loans made to fictitious corporations and other irregular financial transactions that "ran the entire gamut." As part of his audit procedures Boyd stated that:
 "[W]e contacted by telephone or in person those accounts with balances in excess of $2,000, again concentrating on those customers that had more than one account and that procedure would involve contacting the customer, verifying that the customer did exist and that collateral, if any as described on the account did exist. That the customer acknowledged the obligation and that the balance was in agreement with our records. That the customer in acknowledging the obligation agreed to make the payments to continue the liquidation of the account."
During this investigation Boyd discovered five accounts in appellant's name totaling approximately $91,000, one account in appellant's wife's name with a balance of $4,000 and one account in his son's name with a balance of $11,000. Mr. Boyd stated that none of these loans had been paid out any earlier than two years from October of 1978, but that he knew appellant had had accounts with Associates Financial Services prior to that time.
Boyd testified that he was familiar with the $43,000 real estate loan taken out by appellant and his wife on March 6, 1978. He identified State Exhibits 1A-1M which related to the $43,000 loan. These exhibits included the loan application, the appraisal on the twenty acres in Elmore County which showed a purchase price of $60,000, the mortgage and note on the twenty acres, the credit approval for the loan, the title insurance on the property, the disbursement record for the $43,000, and certain other documents signed by appellant and his wife which related to the $43,000 loan. Boyd stated that according to the disbursement record, State Exhibit 1G, $27,834.43 went to appellant and his wife, $5,795.55 went to Associates Financial Services, $192.12 went to appellant and his wife and $10,000 went to Tidmore-Adams Realty.
Boyd next identified State Exhibits 3-6 and verified that these exhibits were the checks issued on the account of Associates Financial Services and signed by Macon Brock and Richard Thornton. These four checks totaled the proceeds from the $43,900 loan transaction. Each of the four checks was made payable to, was endorsed by appellant and his wife, or appellant, his wife and a third party. Boyd determined from Associates Financial Services' transaction journal for March 7 and 8, 1978 that the proceeds from two of the four checks, the one for $27,834.43 made payable to appellant and his wife, and the one for $5,795.55 made payable to appellant, his wife and Associates Financial Services, were used by appellant to pay off prior accounts he had with Associates Financial Services, an account in the name of James Burgess and an account in the name of Joe *Page 1331 
Hood. Boyd explained that the proceeds from the checks were disbursed in accordance with appellant's directions.
 "We put it on there at the direction of the customer. The customer tells us where the funds are to be applied. We don't just take an arbitrary amount from a customer and apply it where we want to apply it. We apply it where the customer says it should be applied."
Boyd testified that he had a conversation with appellant concerning these loans on November 9, 1978. During the conversation appellant informed Boyd that he was a "bookie" and confirmed the existence of the accounts in question.
Boyd further maintained that as far as Associates Financial Services was concerned appellant still owed them money.
 "We have charged off over $100,000 on this man. . . . I'd accept a $100,000 from them today and write them a receipt and say that's paid in full, good luck."
Boyd explained that it was the policy of Associates Financial Services to limit loans on unimproved real estate to 50% of the property's appraised value, but with regional or divisional approval a loan could go as high as 70-80% of the property's appraised value. Boyd stated that the appraised value that was represented on the $43,000 loan for the twenty acres was $65,000. He further stated that it would not have been proper policy to loan $43,000 on collateral worth $10,000.
Bill Adams, a real estate broker with Tidmore-Adams Realtors, testified that he helped appellant and Jimmy Burgess locate the acreage in Elmore County in February, 1978. Adams stated that the purchase price for appellant's twenty acres was $10,000. The asking price had been $550 per acre. He verified that the legal description for the property was the same as the description listed on the $43,000 loan transaction.
Phillip Fisher, a real estate appraiser with Paul Corwin Agency, testified that the twenty acres purchased by appellant would have had a fair market value between $10,000 and $12,000 on the date of purchase. When asked if the property could have been worth $65,000, Fisher responded, "I see no way that it could be anything close to that. That would be a grossly high figure. It's just not worth it."
Mrs. Margie Poole testified that she had been employed with Associates Financial Services under the supervision of Brock. At Brock's direction, she filled out appellant's loan applications. Mrs. Poole stated that appellant came into the office several times a week to see Brock and that, to her knowledge, the normal policy procedures were not followed in the loans made to appellant. For the $43,000 loan Mrs. Poole was directed to use the information on appellant's prior loan applications with Associates Financial Services. She stated, "That was not company procedure at all."
Richard Thorn testified that he had previously been employed with Associates Financial Services and was familiar with Brock's loan transactions with appellant. Thorn stated that he drew up various loan documents, including the $43,000 loan transaction, for appellant at Brock's directions.
From these facts we find that the State's evidence was sufficient to support appellant's conviction for receiving embezzled property beyond any reasonable doubt. The applicable statute for this offense, Ala. Code § 13-3-38 (1975) reads as follows:
 "Any person who buys or receives property knowing that it has been embezzled, fraudulently converted or fraudulently secreted with intent to prevent the recovery thereof or to defraud the rightful owner shall be punished, on conviction, as if he had stolen it.
 "An offender may be tried and convicted under this section although the person who embezzled the property has not been tried and convicted."
Appellant argues correctly that for a conviction of receiving embezzled property it must be shown that the property received was, in fact, embezzled. See Canellos v. State, 17 Ala. App. 278,84 So. 396 (1919). There can be no question in this case that Macon Brock embezzled property from Associates Financial Services in violation of *Page 1332 
Ala. Code § 13-3-20 (1975).[2] It was through Brock's fiduciary relationship as a branch manager with Associates Financial Services that the money was embezzled, or fraudulently converted or secreted, to his own use or the use of appellant and others. From Brock's own testimony it affirmatively appears that he acted intentionally.
Appellant does not challenge the fact that an embezzlement occurred. Instead, he contends that his intimacy with the entire embezzlement scheme indicated that he was an accomplice to the crime of embezzlement and could not, therefore, be a "receiver" of embezzled property. In our opinion, whether appellant was an accomplice to the offense of embezzlement or whether he committed the offense of receiving embezzled property in violation of Section 13-3-38 presented a question of fact for the jury which they resolved. See Thomas v. State,389 So.2d 552 (Ala.Cr.App. 1980).
The trial court correctly charged the jury that if they found appellant guilty of embezzlement, they could not find him guilty of receiving embezzled property, and conversely, that if they found appellant guilty of receiving, they could not find him guilty of the actual embezzlement. The jury decided appellant was guilty of receiving embezzled property. Certainly, the facts support their conclusion. Every material ingredient for the offense was proved beyond any reasonable doubt. Canellos, supra. Clearly, appellant knew that the checks[3] he received, which represented the proceeds from the fraudulent $43,000 loan transaction, had been embezzled. Despite his contention to the contrary, we find that appellant's receipt of the checks was sufficient to constitute receiving embezzled property. Each of the four checks issued in connection with the $43,000 loan transaction required appellant's endorsement, and it cannot be said that he did not have control and dominion over the embezzled property. By receipt of the checks appellant was able to purchase twenty acres of property, pay off the debt he owed to Jimmy Burgess, pay off the account taken out in Joe Hood's name, pay off certain of his "personal" loans with Associates Financial Services and make payments on still other loans with that company. It does not matter that none of the money went directly into appellant's pocket. It is obvious that Associates Financial Services was defrauded by this action.
Thus, the State not only proved that the property appellant received had been embezzled, but it also proved the additional elements necessary for receiving embezzled property which are set out in Canellos, supra:
 "It must also be shown by the evidence beyond a reasonable doubt that the defendant at the time knew that the goods had been so embezzled and had the intent to prevent the recovery thereof, or to defraud the rightful owner. . . ." 84 So. at 398.
In Thomas, supra, the defendant could have been found guilty under evidence of either larceny or buying, receiving, or concealing stolen property. This court wrote the following:
 "Where the evidence affords a reasonable inference that the offense for which one is charged has been committed, the court must submit the question of the sufficiency and weight of the evidence tending to support that inference to the jury. Young v. State, 283 Ala. 676, 220 So.2d 843 (1969)." 389 So.2d, at 556.
The jury was properly charged in this case and we find no error.
Furthermore, we find that as a matter of law, appellant was not convicted on the uncorroborated testimony of an accomplice. *Page 1333 
Just as the receiver of stolen property is not, as a matter of law, an accomplice to the thief, Childs v. State, 43 Ala. App. 529, 194 So.2d 861 (1966), cert. denied, 280 Ala. 711,194 So.2d 864 (1967), neither is one who receives embezzled property an accomplice to the embezzler. Even assuming that Macon Brock was an accomplice to appellant, we find that his testimony was sufficiently corroborated. Yarber v. State,375 So.2d 1229 (Ala. 1978); Jacks v. State, 364 So.2d 397
(Ala.Cr.App.), cert. denied, 364 So.2d 406 (Ala. 1978).
Moreover, we do not find that appellant has received criminal sanctions in this cause for the nonperformance of his obligations under a contract, i.e. his failure to pay back the $43,000 loan. That body of law which condemns the use of criminal sanctions to enforce the collection of civil debts [4]
does not apply here. While appellant may, in fact, still be obligated from a contractual standpoint to repay the $43,000, as well as other monies, to Associates Financial Services, this prosecution did not arise out of the fact appellant owed money; rather, it arose because appellant had received embezzled property in violation of Ala. Code § 13-3-38 (1975). The crime in this case is predicated upon appellant's "tortious act" of receiving embezzled property, not upon his failure to perform under a contract. See Davis v. State, 237 Ala. 143, 185 So. 774
(1938).
 III
In response to a pretrial motion by appellant, the trial court entered an order requiring the State to produce "any documents . . . which are clearly exculpatory as to defendant." On the first day of trial, a Monday, appellant learned that there were two documents in the possession of the State which he had not seen. The documents belonged to Associates Financial Services and related to accounts listed in the names of Jimmy Burgess and Joe Hood and paid off out of appellant's $43,000 loan transaction.
Defense counsel had been to the district attorney's office the previous Thursday and had been given all the documents then in the possession of the prosecution. According to one of the assistant district attorneys prosecuting the case:
 "I had Mr. Whitesell, Mr. Riggs and Mr. Shinbaum come to my office and gave them my whole box, Your Honor, of all the records I had. I didn't know whether or not they had received any records from Associates or not. I told them, here's what I had in order comply with the Court's order."
The prosecution did not come into possession of the two additional documents until 5:00 P.M. on Friday afternoon. The prosecution admitted that it had not called defense counsel over the weekend, but stated that any failure to comply with the court order to produce was unintentional.
After further discussion the trial court ordered that the two documents be produced for the inspection of defense counsel. The trial was then continued until 10:00 A.M. the next morning. No further motions were made by the defense on this matter when the second day of trial began.
Appellant maintains that the two documents were exculpatory in nature and that the State's failure to produce them before trial was violative of the trial court's order. We find no error in the trial court's decision in this matter.
A close examination of the record reveals that at the time it became apparent that the two documents had not been handed over, defense counsel simply requested the following:
 "We want these files produced for our inspection and time to inspect them before cross-examination of this witness and any witness concerning this case."
The trial court saw that this was done. Defense counsel further stated:
 "I really don't, personally don't want a mistrial. I want to go ahead and try the lawsuit but I'm charged under oath with the duty to represent my client and my client said I'd have to ask for one." *Page 1334 
The grant or denial of a mistrial is a matter within the sound discretion of the trial court which will only be disturbed upon a showing of manifest abuse. Durden v. State,394 So.2d 967 (Ala.Cr.App. 1980), writ quashed, 394 So.2d 977
(Ala. 1981). We find no such abuse here. As this court stated in Jones v. State, 396 So.2d 140, 142 (Ala.Cr.App. 1981), an opinion authored by Judge Clark:
 "Although suppression of evidence to which a defendant is entitled in a criminal case may constitute a violation of the due process clause of the Fifth Amendment as amplified in coverage by the Fourteenth Amendment to the Constitution of the United States irrespective of whether the suppression has been intentional, the evidence must have a material bearing upon the question of the guilt or innocence of the defendant, which would exclude evidence that tends merely to cause defendant to over extend himself tactically. . . .
. . . .
 "The protection of the due process clause is primarily in the field of exculpatory rather than inculpatory evidence. Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963)."
While the absence of the two documents may have given defense counsel the impression that the prosecution had made a "mathematical error" in their computation of the proceeds which were disbursed out of the fraudulent $43,000 loan, we do not believe that these two documents were exculpatory or consistent with appellant's innocence. If anything, the documents tend to show the series of loose ends appellant was attempting to tie by receiving embezzled property.
 IV
It was not error for the State to refer to appellant as a "bookie" during its case in chief and during closing argument. The entire record is replete with evidence of gambling activities. Many references to appellant as a "bookie" or "bookmaker" came through the testimony of witnesses and remarks by the prosecution were not made out of context.
Appellant's gambling activities led to the offense, seeKelley v. State, 409 So.2d 909 (Ala.Cr.App. 1981), cert. denied, (Ala. 1982), and evidence that he was a "bookie" or "bookmaker" was admissible to show his motive for receiving embezzled property. A prosecutor as well as defense counsel had the right to present his impression from the evidence. He may argue every legitimate inference from the evidence and may examine, collate, sift, and treat the evidence in his own way. See Watson v. State, 398 So.2d 320 (Ala.Cr.App. 1980), cert. denied, 398 So.2d 332 (Ala. 1981) and authorities cited therein.
We have examined each issue raised by appellant and find no error. Therefore, the judgment of conviction by the Montgomery Circuit Court is affirmed.
AFFIRMED.
All the Judges concur.
[1] The trial court made reference to this in its oral charge. There is nothing in this record which demonstrates what witnesses testified at the July Term of the Montgomery County Grand Jury or whether that grand jury returned a true bill or a no bill against appellant.
[2] For the elements which must coexist to support a conviction for embezzlement under Ala. Code § 13-3-20 (1975), see Pullam v.State, 78 Ala. 31 (1884).
[3] Ala. Code § 13-3-39 (1975) provides:
 "In an indictment for embezzlement or other offense under this article, it is sufficient to describe the property in general terms, as `money,' `bank notes,' `checks,' `bills of exchange,' or other evidence of debt, of or about a certain amount."
[4] See Harris v. State, 378 So.2d 257 (Ala.Cr.App.) cert. denied, 378 So.2d 263 (Ala. 1979).