This is an appeal from a conviction of assault.
The appellant, Tyrone G. Davis, was certified to stand trial as an adult on a charge of attempted murder. A jury found him guilty of the lesser-included offense of assault in the first degree and he was sentenced to 20 years' imprisonment.
The evidence presented at trial was conflicting. It was undisputed, however, that on the evening of January 13, 1992, the appellant and his friends, Leroy Cole, Jr., and James Montgomery, were together and that they had a gun. It also was undisputed that the same evening, Jack Wolfe was shot in the back as he was jogging. Wolfe stated that before he was shot he saw three young black males and heard two sounds that he thought were fireworks. He continued jogging and a few minutes later, he was approached by a black male who said someone was shooting at them. When Wolfe turned, he was shot in the back. Wolfe believed that the person who had just called out to him had shot him.
Three police officers testified. Officer James Parker testified that he interviewed Jack Wolfe concerning the shooting at approximately 9:50 p.m. He later learned that this incident was connected to a car theft and a subsequent shooting and turned the investigation over to Sergeant Andy Jackson and Investigator Jack Pugh. Jackson testified that he was called to the hospital emergency room at approximately 11:00 p.m. with regard to the shooting of Leroy Cole, Jr., near the intersection of Kimbrell and Maggie Streets. Cole told him at that time that he had been shot during a struggle with three unknown black males that he was unable to identify. Later, he added that he had been with Montgomery and the appellant earlier in the day. The following day, Jackson had Montgomery and the appellant brought to his office for questioning. *Page 54 
Montgomery first told Sergeant Jackson that he and the two others had left school and had gone to Cole's house, then to a shopping mall and back to Cole's house. When Jackson informed him that this story was inconsistent with Cole's statement and that he suspected them of a car theft and of shooting a jogger, Montgomery said that he was not "taking the rap for anybody." Jackson read him his rights, and Montgomery then said that Cole had stolen a car and that the appellant had wrecked it. As he abandoned the vehicle, they noticed a jogger nearby. The appellant got a gun from Cole and fired two shots into the air. He said that the appellant then ran after the jogger, and Montgomery heard a third shot as he and Cole were running to Cole's house. Montgomery said that the appellant later returned the gun to Cole and that Cole left the house with it and Montgomery subsequently learned that Cole had himself been shot. After Montgomery had put this statement in writing, his parents came to the police station. At that time, Montgomery admitted that it was he, not the appellant, who had fired the first two shots.
Jackson then had Leroy Cole, Jr., and his parents brought to his office. Cole changed the statement he had made at the hospital and stated instead that he, Montgomery, and the appellant had been in a stolen car when it was wrecked and that they had then spotted a man jogging. He said that Montgomery had the gun and that he started shooting at the jogger and that the appellant then got the gun and shot the jogger in the back. He further stated that he accidentally shot himself while he was in the process of hiding the gun.
Earlier, while Sergeant Jackson was interviewing Montgomery, Investigator Pugh questioned the appellant. Like Montgomery, he was questioned about the shooting of Leroy Cole, Jr., concerning which he gave both verbal and written statements. Jackson then came into the interview and told them that Montgomery had implicated the appellant in the jogger shooting. Jackson advised the appellant of his juvenile Miranda rights, and the appellant called his guardian. Pugh then took him to be fingerprinted, and the appellant stated that he wanted to "tear up" his earlier statement. Pugh returned it to him and he destroyed it, and Pugh then advised him of his rights. The appellant wrote out a two-page statement, which said that after the appellant and the two others had wrecked the car, Montgomery took Cole's gun and fired it twice. The appellant then fired the gun once and returned it to Cole. After completing his statement, the appellant was taken to a detention center. During the trip, he mentioned running past the jogger and telling him that there had been shooting behind him. When he arrived at the detention center, he added this information to the second page of his statement.
At trial, Montgomery's testimony was essentially the same as his statement to Sergeant Jackson. He added that the appellant had stated that he was going to shoot someone and that he later admitted shooting the jogger in the back. Cole's testimony at trial also was essentially the same as his statement. The appellant testified in his own behalf, giving essentially the same factual information as presented by Montgomery and Cole, to the point in time when the appellant got the gun. The appellant stated that he fired the gun once into the air and then returned it to Cole, and that Montgomery then said he wanted to fire the gun again. The appellant said that he ran to warn the jogger and that thereafter he heard a shot and saw his companions running away.
 I.
The appellant contends that the trial court erred in denying his motion to suppress his handwritten statement to Investigator Pugh. He argues that he was initially questioned without being advised of his rights, that he was questioned after he told officers that he did not want to make a statement concerning the shooting of the jogger, and that he was "pressured and tricked" into giving the written statement and the subsequent addition thereto.
The testimony at the suppression hearing indicated that the appellant was initially picked up by law enforcement officers at the residence of Leroy Cole, Jr., and that he was transported to the police station for *Page 55 
questioning as a possible witness in the shooting. At that time, he was in custody and should have been given the warnings required by Miranda v. Arizona, 384 U.S. 436,86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Therefore, had his initial statements to Officer Pugh been offered, they would not have been admissible at trial.
However, shortly after the appellant gave his initial statements, the officers learned of his possible involvement in the jogger shooting and Sergeant Jackson gave him theMiranda warnings. An invalid statement which is obtained when a defendant is in custody and before Miranda warnings are given does not taint a subsequent, voluntary statement obtained after the warnings are given. Oregon v. Elstad, 470 U.S. 298,105 S.Ct. 1285, 84 L.Ed.2d 222 (1985). Therefore, the appellant's subsequent statement was admissible if it was made voluntarily.
Officer Pugh testified that although the appellant indicated after making his initial statements that he did not wish to speak further with the officers, he thereafter asked Pugh whether he could tear up his earlier written statement. Pugh responded that it was entirely up to the appellant and he said he wanted to make it clear he was not pressuring him in any way. Pugh testified that the appellant then tore up the statement; neither it nor the initial verbal statements were offered at trial. Pugh testified that he then again advised the appellant of his Miranda rights and that the appellant executed a second written statement. Thereafter, Pugh allowed the appellant to add to that statement the information that he had run past the jogger and had called to him.
Based on the testimony, we conclude that the discussion about the appellant's changing the initial written statement was not in response to further interrogation by officers, as the appellant argues, but was initiated by the appellant himself. There is no evidence that either that discussion or the appellant's subsequent written statement was the result of emotional manipulation or "pressure or trickery," as the appellant contends. Because the statement offered at trial was made after Miranda warnings were given and was voluntary, it was properly admitted into evidence.
 II.
The appellant contends that the trial court erred in admitting the gun and photographs of the gun into evidence without proving that the gun was, in fact, the weapon used to shoot the victim. He argues that there was no forensic evidence to link the gun to the crime and that there was no evidence that, if it was the gun used in the crime, it was in substantially the same condition as when the crime occurred.
"Articles or objects which relate to or tend to elucidate or explain issues or form a part of the transaction in question are admissible in evidence when duly identified and shown to be in substantially the same condition as at the time of the occurrence." C. Gamble, McElroy's Alabama Evidence, § 319.02 (4th ed. 1991). Here, forensic evidence was not available because the bullets could not be removed from the bodies of the two victims and no shell casings or fingerprints were found. However, Leroy Cole, Jr., clearly identified the gun introduced at trial as the one he had had for approximately two months before the shootings. Cole stated that the appellant had the gun right before the jogger was shot, and James Montgomery testified that he saw the appellant return the gun to Cole after the shooting. Cole testified that he then hid the gun in a flower box next to a mailbox, where it subsequently was recovered by Sergeant Jackson and a crime scene investigator. The investigator's photographs demonstrated that the gun was in substantially the same condition at trial as when it was recovered. There was no evidence of tampering. Under the circumstances, the trial court did not err in admitting the gun or the photographs into evidence.
 III.
The appellant contends that the trial court erred in overruling his "timely objection" to the jury venire, which he states was made both in his motion for a judgment of acquittal and "immediately following the jury venire." However, the record filed with this *Page 56 
Court contains only the motion, which was made at the close of the State's case and was untimely. Although the appellant states that his objection at trial "was inadvertently omitted from the transcript by the Court Reporter," this claim is insufficient to preserve the issue for appellate review. It was the duty of the appellant to file a correct record,Davis v. State, 549 So.2d 577 (Ala.Cr.App. 1989), in the absence of which, there is nothing on which this Court can predicate a finding of error.
 IV.
The appellant contends that the trial court erred in calling Leroy Cole, Jr., as the court's witness under Rule 19.2, A.R.Cr.P. He argues that this action was prejudicial because, he argues, it gave Cole's testimony a level of credibility that exceeded his own. However, the record reflects that he made no objection at the time the witness was called, as required by Rule 19.2(b)(1), A.R.Cr.P. Therefore, this issue was not preserved for review on appeal.
 V.
The appellant contends that the trial court erred in overruling his motion for a judgment of acquittal because, he says, the State failed to prove beyond a reasonable doubt that he was guilty of shooting the victim. He argues that his conviction is based on doubtful identification, insufficient circumstantial evidence and "conflicting/confusing," "inherently incredible" or "uncorroborated accomplice" testimony.
However, neither Leroy Cole, Jr., nor James Montgomery was charged as an accomplice in the shooting. They testified that the appellant took Cole's gun and ran after the victim after the first two shots had been fired. They said that they then heard a third shot, and the appellant later told Montgomery that he had shot the victim. Any question as to the credibility of these witnesses was for the jury to determine. In addition, the testimony of these two witnesses was consistent with that of the victim, who stated that he was hit after hearing two earlier reports that he had dismissed as fireworks. The victim further stated that the shot came from the area from which the appellant admitted calling out to him. Based on the record, there clearly was sufficient evidence for the trial court to submit the case to the jury and sufficient evidence to support the jury's finding of guilty.
 VI.
The appellant contends that the trial court erred in excluding his guardian from the courtroom when the guardian was observed talking to one of the State's witnesses. He argues that there was no showing that the guardian was guilty of any of the conduct prohibited by Rule 9.3, A.R.Cr.P., and that his absence prejudiced the defense by depriving the appellant of the presence of a family member. However, the record reveals that the appellant failed to object at trial to the exclusion of his guardian. In the absence of a timely objection, nothing was preserved for review on appeal.
 VII.
The appellant contends that the trial court erred in failing to determine, as a matter of law, that Cole and Montgomery acted as his accomplices in shooting the victim. In the alternative, he contends that the court should have instructed the jury with regard to accomplice testimony.
However, it is only when there is no conflict in the testimony that the accomplice determination is one of law for the court. Jacks v. State, 364 So.2d 397 (Ala.Cr.App.), cert. denied, 364 So.2d 406 (Ala. 1978). Here, the appellant had the burden of showing the witnesses' complicity. Montgomery stated that he and Cole had told the appellant if he had to shoot someone, shoot the jogger and not them; however, Montgomery also specifically testified that this statement was not a dare and that the appellant snatched the gun and ran off with it. The evidence, therefore, was insufficient to establish that either Montgomery or Cole was an accomplice, and no jury instruction was required.
AFFIRMED.
All Judges concur. *Page 57