[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 558 
The indictment in this case was returned in April 1983 by a grand jury of Mobile County, which charged in pertinent part:
 ". . . Larry Singletary whose name is to the Grand Jury otherwise unknown than as stated, unlawfully, and with malice aforethought, killed Charles Wayne Fleming by strangling him with a wire, stabbing him with an ice pick, or by striking him in the head with an unknown instrument, in violation of § 13-1-70 of the Code of Alabama, against the peace and dignity of the State of Alabama."
As of the date of the return of the indictment, there was no such crime as that charged in the indictment. However, at the time of the victim's death in 1976, the crime alleged in the indictment constituted murder in the first degree, which was punishable at the discretion of the jury by death or imprisonment for life, other than as prohibited as to the death penalty provision thereof by the pronouncement of the Supreme Court in Furman v. Georgia, 408 U.S. 238, 92 S.Ct. 2726,33 L.Ed.2d 346 (1972). The jury fixed defendant's punishment at imprisonment for life, and the court sentenced him accordingly. The death penalty had not been restored in Alabama at the time of the death of the victim in this case.
Cleve Ray McKinney, who was a partner of the victim in the business of remodeling homes, testified that on January 12, 1976, he went to the apartment where the victim lived in Yester Oaks Apartments and found the victim dead. Photographs were introduced of what the witness observed, which disclosed that the death was caused by acts of violence. Mr. McKinney promptly alerted law enforcement authorities, who arrived at the scene soon thereafter.
Dr. Earl Wert, a physician, who had been coroner of Mobile County on January 12, 1976, performed an autopsy upon the body of Charles Wayne Fleming. He testified:
"Q. And what did your autopsy reveal, sir?
 "A. Multiple injuries involving the head and neck and the chest with hemorrhages to the head and a wire around the neck, which could have produced strangulation and multiple penetrating wounds of the heart and massive hemorrhage into the chest. *Page 559 
 "Q. Approximately how many penetrating wounds to the heart did your autopsy "A. According to my report, I forget the exact number, but it was perhaps twenty — thirty.
"Q. Twenty to thirty?
"A. Yes.
 "Q. And, were these wounds of a large type or those that would be consistent with punctures by a long slender instrument?
 "A. Consistent with puncture by a long slender instrument.
 "Q. Do you have an opinion, with reasonable medical certainty, as to the cause of death?
 "A. The probability is that the wounds of the — of the heart with massive hemorrhage produced death with the — with the possibility that the wounds of the head and suffocation from the wire contributed to the death."
The only eyewitness to the acts of violence causing the death of Charles Wayne Fleming was Leon Addison, who at the time of his testimony lived in Jacksonville, Florida. He testified on call of the State, and at the commencement of his testimony it was made clear that he was a participant in the murder of Charles Wayne Fleming, and that he had agreed to waive his constitutional rights against self-incrimination upon his having been assured of immunity by the State. At the time of his testimony, it had been made clear also to the judge and to the jury that at the time of the victim's death he had been married to "a lady named Kay Fleming" but that the two were not living together at the time of the death of Mr. Fleming, that he was living, as shown above, in Mobile, Alabama, and that she at the time was living in Valdosta, Georgia, where she was the owner of the Mai Tai Lounge and that among the habitues of the lounge, were the witness Leon Addison, the defendant, and Angelo Whatley. It is undisputed that Kay Fleming and Angelo Whatley had died before the commencement of the trial.
We quote from the testimony of Leon Addison:
"Q. Do you know Larry Singletary sitting here?
"A. Yes, I do.
"Q. What relation are you to him?
"A. He's my brother-in-law.
 "Q. Did you know a man named Angelo Whatley back in 1976?
"A. Yes, I did.
"Q. Did you know a lady named Kay Fleming?
"A. Yes, I did.
". . . .
 "Q. All right, sir. Now, you told us a few minutes ago that you have seen this man over here commit murder, would you go back before that time and tell the jury about how that whole thing got started? Go ahead, sir.
 "A. Well, we were riding around drinking and the subject came up.
"Q. Who is we?
 "A. Myself, Larry Singletary, Angelo Whatley and Kay Fleming.
". . . .
 "A. She asked us did we want to make $6,000.00 a piece.
 "Q. And then, did she tell you what you had to do for it?
"A. Yes.
"Q. What was that?
"A. It was to murder her — to murder her husband.
". . . .
 "MR. COPELAND [Prosecuting attorney]: Now, did — did you take her up on that immediately, or did you think about it?
"A. It was thought about just briefly.
 "Q. And, in — based on that arrangement that ya'll had, where was the money supposed to come from?
 "A. Off of the insurance policy she had on Mr. Fleming.
 "Q. All right. And, based on that arrangement, did you three come here to Mobile?
"A. Yes.
"Q. And, where did you leave from? What city? *Page 560 
"A. Dawsonville, Georgia.
". . . .
 "Q. And did you have — did you three have anything with you that would allow you to get inside where Wayne Fleming lived?
"A. Yes, we were provided with a key.
"Q. With a key?
"A. A key.
"Q. Who gave you the key?
"A. Kay Fleming.
 "Q. Now, what was you all's appearance back then as far as your hair length?
"A. It was basically down to our shoulders.
 "Q. Now, what was your role supposed to be, what ya'll came over here to do?
 "A. I was to go in the house tearing everything up, just make it look like a burglary.
". . . .
 "A. He [Mr. Fleming] came down the stairs, and Larry Singletary grabbed him from behind and was choking him out, and Angelo Whatley was stabbing him.
 "Q. And when you saw Larry Singletary grabbed him from behind, did you — did you see what he used to grab him from behind with?
 "A. He had some type of wire, like a picture frame wire.
"Q. And what did Angelo use to stab him with?
"A. He used an ice pick.
". . . .
 "Q. Now, do you know how many times Angelo Whatley stabbed the man that you saw?
"A. Several times.
 "Q. Can you put an estimate on it, or is that possible?
"A. It's not possible.
". . . .
 "Q. Now, did you do anything to fulfill your role as making it look like a burglary?
"A. Yes, I did.
"Q. What did you do?
 "A. I tore out dressers, just scattered the place mostly.
 "Q. When you all left, in accordance with making it look like a burglary, did you take any items of property with you?
"A. Yes, we did.
"Q. What did you take?
 "A. There was a diamond ring, a gold watch, his wallet, and a .22 caliber rifle.
". . . .
Q. Did you all go back to Valdosta?
"A. Yes.
 "Q. Did you see Kay Fleming again regarding what you had done?
"A. Yes.
". . . .
 "Q. Now, the money that you were promised, did you ever receive?
"A. Never.
"Q. And how do you feel about that?
"A. I'm glad I didn't. I'm thankful that I didn't."
Ms. Janet Dorch testified on call of the State that she was married to Angelo Whatley in 1976, and that after four years the marriage ended in divorce. A part of her testimony was as follows:
 "Q. And, did you have occasion in 1976 when Angelo and Larry Singletary were present when they discussed a crime they committed?
"A. Yes.
"Q. Where did that conversation take place?
 "A. It was at my house in the dining room. We were sitting around the table.
"Q. Who all was there?
"A. Me, and Angelo, and Larry.
 "Q. And, about — maybe the best way to ask you what time this was made is to ask you how long after you were married to him, approximately, did the conversation take place?
"A. Six or eight months.
 "Q. Now, what did Angelo Whatley say to you in Mr. Singletary's presence —
 "MS. PERRY [Defendant's attorney]: Judge, I'll object —
"THE COURT: Overruled.
"MS. PERRY: — To hearsay. *Page 561 
"THE COURT: It's not hearsay, overruled.
"MS. PERRY: He's not in court.
 "WITNESS: Angelo told me that he and Larry and Leon went to Mobile and killed a man, Mr. Fleming.
 "Q. Mr. Fleming. And, did he tell you how they got there or anything like that? "A. Yeah, they drove Angelo's car and left Valdosta one night and came back the same night.
"Q. Did he say where they went?
"A. To Mr. Fleming's apartment or — in Mobile.
"Q. Did he say how they got in?
"A. They had a key.
 "Q. Did he tell you how they came to go down there, what the reason was?
"A. Un — his wife had hired them to kill him.
"Q. Who is his wife?
"A. Kay Fleming.
"Q. Did he tell you how the man was killed?
"A. They stabbed him, choked him and stabbed him.
 "Q. Did he tell you who participated in the actual killing?
"A. I believe it was Angelo and Larry.
 "Q. And, was any — while all this was going on, what did Larry Singletary do?
"A. While Angelo was telling me you mean?
"Q. Yes, ma'am.
 "A. Well, he sat there and watched me to see how I was going to react —.
"MS. PERRY: Judge, I'll object to the reasoning?
"THE COURT: Overruled.
 "MR. COPELAND: Now, did they have any discussion about how they were going to get paid?
 "A. Kay was going to give them some insurance money that she had a life insurance policy out on her husband, and she was going to give them a — Angelo said $8,000.00 a piece."
An agent of the Liberty National Life Insurance Company testified that he was the custodian of the records of the company, that in January of 1976 three life insurance policies were issued by the company on the life of Charles Wayne Fleming with Kay V. Fleming as the beneficiary for the total face value of $14,000.00, and that on July 20, 1976, Kay Fleming was paid the amount then owing on the policies.
Russell Harry Wells of Steihatchee, Florida, testified that "back in 1976" Leon Addison, Angelo Whatley, Kay Fleming, and Larry Singletary came to his trailer, where he and his wife were then living. According to his testimony, Kay, Angelo, and Leon went inside and Singletary stayed in the yard and talked with Wells. We quote the following from Mr. Wells's testimony:
"Q. Yes, sir. What did he tell you?
 "A. He told me he had made some money or was fixing to make some money and approached me about us going and gamble with it.
"Q. Why would he approach you about gambling?
 "A. I've worked at three major casinos in Las Vegas, Nevada, and gambled, professional gambler.
". . . .
 "Q. And, he asked you about helping him on some money he was going to come into?
 "A. He just said he was going to come into some money and wanted me to yes, let's gamble it, and I told him yeah, I'd go for anything.
 "Q. But did he then tell you about how he was going to get that money, why?
"A. Yeah, he did.
"Q. What did he tell you?
 "A. He told me that they had snuffed a — Kay Fleming's husband, and they were supposed to get $6,000.00 a piece when she collected her insurance.
"Q. Did he tell you where it was — took place?
"A. He said in Mobile, Alabama.
"Q. Did he tell you how it was done?
 "A. He said they choked him, and stabbed him, and beat him." *Page 562 
According to additional testimony of Mr. Wells, approximately six or seven months after the conversation between him and Mr. Singletary from which we have just quoted, Mr. Singletary told the witness that "it looked like he was going to have to snuff Kay cause he hadn't got his money."
There were witnesses called by the State in addition to those named above whose testimony we have briefly discussed, but we believe we have stated enough of the evidence for the State to enable us to correctly determine the issues presented on appeal.
Seven witnesses testified on call of the defendant. They were Jerry Leonard Cowart, Jack Bennett, Jr., James Terry, Janet Dorch (who had previously testified on call of the State), Aletha Addison, Sergeant John Boone and Officer Woodrow Steiner, Jr.
Three of the defendant's witnesses, Cowart, Bennett, and Terry, were inmates of the Mobile County Jail during some of the time the defendant was confined therein to await trial of his case. Their testimony was to the effect that defendant had not made any inculpatory statement as to any connection by him with the murder of Mr. Fleming, which testimony tended to contradict the testimony of another inmate of the jail during the same time, who had testified as a witness for the State that there was an inculpatory statement made by defendant. Janet Dorch, while testifying as a witness for the State, was asked some questions as to a tape recorded conversation between her and law enforcement authorities that defendant's attorney contended was in conflict with her testimony. The following is an excerpt from her testimony as a witness called by defendant:
 "And, Larry wasn't even present when you were talking to Angelo about these things?
 "A. I don't know about — I don't remember saying that.
"Q. You don't remember saying that?
"A. (No audible response).
 "Q. Do you recall saying that it was your speculation your guess that Larry had something to do with this murder?
"A. No —
 "THE COURT: Wait a minute. You asked her one question, already, are you going to give her an opportunity to answer that one question?
"MS PERRY: Yes, sir.
 "Okay. This is after the tape recorder had been cut off and put back on. You were questioned, and you say that basically on the occasion that you told us about apparently all Larry said was well did you tell her everything, she'd better not tell something of that nature, just interested in any details of what they might have discussed or . . ., your answer was, no, no, no, they were never like that, if they ever discussed it between themselves, I was never around, and that's the way they were with everything?
"A. Uh-huh, I don't — I don't remember.
"Q. You don't remember making this statement to —
"A. Now, I'm not — if it's here, I did, so —
"Q. And, you —
"MR. COPELAND: Now, let her finish.
"MS. PERRY: Okay, finish.
 "WITNESS: When I made this statement, Angelo had just died.
"Q. Um-hum.
 "A. I had been married to him for four years, and when he died, everything that I went through in those four years came down around me.
"Q. I can understand that.
 "A. I was — I'm a lot more clear headed about it now than I was then."
The testimony of the witness on direct examination by defendant's counsel continued for several pages of the transcript, in which the witness testified to the effect that there was some inconsistency between what she had told the authorities and what she had testified on the trial, which inconsistencies she attributed largely to the length of time between 1976 and her conversations with the authorities that was *Page 563 
tape recorded and played back to her while she was on the witness stand.
Aletha Addison, the wife of Leon Addison and sister of defendant, testified at length as to the long time prior to the trial that Leon was under investigation by the authorities as to the murder of Mr. Fleming and as to the many times the authorities had contacted Leon.
Sergeant John Boone of the Mobile Police Department testified that on September 23, 1982, he commenced investigating the apparent murder of Mr. Fleming. He testified that other officers had conducted an investigation of it as far back as 1976. In the course of the direct examination of the witness by the defendant's attorney, it was shown that there was "a young lady that was arrested in 1976 who was released for insufficient evidence." Sergeant Boone testified he understood that during the initial investigation "lipstick stains" were found on "the underclothes" of Mr. Fleming, that the room where he died and the furnishings thereof were processed for fingerprints but that he knew nothing about the fingerprints. During his testimony, Sergeant Boone testified at length in response to questions asked by defendant's counsel and State's counsel as to conversations he had with Leon Addison, Larry Singletary, and Harry Wells and information he had obtained as to latent fingerprints that had been lifted from the walls and furniture of the room where the murder occurred. He said he understood the fingerprints had been inadvertently destroyed by a fire in the building where they had been stored.
Corporal Woodrow Steiner, Jr., testified that he was assigned to the Criminal Investigation Division of the Mobile Police Department in 1976 and was one of the officers who conducted the initial investigation. According to his testimony, a female was arrested and charged with the crime by another officer. The witness said he "brought the lady back to Mobile from Tennessee" but that the case against her was nol-prossed because of insufficient evidence.
 I.
As the first issue presented by appellant, appellant contends:
 "THE TRIAL COURT COMMITTED REVERSIBLE ERROR IN ALLOWING THE STATE OF ALABAMA TO IMPROPERLY AND VINDICTIVELY INTRODUCE EVIDENCE OF APPELLANT'S CHARACTER AND PRIOR CRIMINAL RECORD DURING THE TRIAL AGAINST HIM."
Appellant divides his argument as to this issue into two distinct parts with headings respectively of A, B, and C. We consider them under the same headings.
 A.
Appellant argues that the trial court committed reversible error "in refusing to grant Appellant's motion for mistrial upon the prosecutor's improper and vindictive introduction of evidence of Appellant's prior criminal conviction." The contention is directed at a part of the State's cross-examination of witness Sergeant Boone after he had testified on direct examination that defendant told him "he had heard about the murder, but he didn't have anything to do with it." The cross-examination of the witness complained of by defendant on the trial and now on appeal was as follows:
 "Q. Did you tell him any of the details everybody testified to today?
 "A. I showed him a newspaper clipping about Angelo Whatley being killed up in Middleberry, Indiana, cause —
 "Q. No, sir, I mean did you tell him any of the details about what happened at this homicide, exactly what we had against him?
"A. No, sir, I don't give out details about crimes.
 "Q. And, since we've gone into that statement this far, he told you he'd been convicted of forgery his own self, didn't he?
 "MS. PERRY: I'll object to that, Judge, that's improper —
"THE COURT: Sustained — *Page 564 
"MS. PERRY: — And I'm moving for a mistrial.
 "THE COURT: Denied, but I sustain the objection. Disregard his last question.
"MR. COPELAND: I have no further questions.
"THE COURT: You may step down.
"WITNESS: Thank you, Judge.
 "MS. PERRY: Your Honor, I'll renew my motion for a mistrial.
"THE COURT: And, I renew my ruling."
Appellant correctly shows that before the trial of the case commenced, defendant submitted to the court a motion in limine, as to which the following occurred:
 "MS. PERRY: Your Honor, this is a Motion in Limine to exclude and to instruct the D.A. from mentioning in any way any charges that Mr. Singletary was dealing with, facing time on, serving time on —
 "THE COURT: If he doesn't take the stand, he cannot say anything like —
"MS. PERRY: — In Georgia.
 "THE COURT: — That, and you certainly need no Motion in Limine to do that.
"MS. PERRY: Okay, Your Honor —
 "THE COURT: And if he should mention anything about any other charge or any other crime, I would not only grant a mistrial. I'd put him in jail. Is that strong enough?
". . . ."
We agree with appellant that the question asked by the prosecuting attorney was improper, that it was in conflict with the order the court had uttered as to the motion in limine and that the trial court was correct in sustaining the defendant's objection to the question. However, we are not persuaded that the question was asked vindictively by counsel for the State. In the light of the statement by the trial court that if any such question were asked by the State the questioner would be put in jail, we are inclined to think that State's counsel would not have dared to violate intentionally the court's order. In our opinion, the trial court was not in error in overruling defendant's motion for a mistrial.
 B.
Appellant here urges that reversible error was committed by the trial court "in allowing the State of Alabama to improperly introduce a statement allegedly made by Appellant to adverse witness John Wayne Boone, said statement constituting inadmissible character evidence." This contention is directed at that part of the cross-examination or recross-examination of the witness as follows:
"A. Yes, sir.
 "Q. You remember when he asked you are you a truthful person?
"MS. PERRY: Judge, I'll object to this.
"THE COURT: Did you ask him what?
"MR. COPELAND: Are you a truthful person?
"THE COURT: And who is he —
 "MR. COPELAND: That man over there (indicating the Defendant.)
 "THE COURT: Overruled. "MS. PERRY: Judge, I'll object to this kind of testimony —
 "THE COURT: You already have and I've already ruled —
 "MS. PERRY: — There's been no predicate, there's been no predicate, and —
"THE COURT: I say you've already —
"MS. PERRY: — it's improper and inadmissible.
 "THE COURT: I would assume that's the reason you object any time, and I have ruled, and he may answer the question.
"WITNESS: Yes.
 "MR. COPELAND: You asked him are you a truthful person?
"A. I remember asking him.
"Q. What did he tell you?
"MS. PERRY: I'm going to object to this, Judge —
"THE COURT: Overruled.
"MS. PERRY: — It's not relevant at this trial.
"MR. COPELAND: What did he tell you? *Page 565 
"A. Most of the time."
We are not in full agreement with the trial court's rulings as shown by the transcript just quoted. However, we are convinced that there was no substantial infringement by the questions of the exclusionary rule as to the general character and reputation of defendant or as to his reputation for truth and veracity or the opposite. We think that under all the circumstances, including the answer of the witness, that defendant told him that he (the defendant) was truthful most of the time, no error was committed prejudicial to defendant resulting from the testimony of the witness that defendant told the witness that the defendant was a truthful person most of the time.
 C.
As to the third part of appellant's first issue, he contends that reversible error was committed in allowing the State "to prove Appellant's commission of prior unrelated offenses, which were irrelevant and immaterial during the trial of the instant offense." The third part of appellant's argument as to this issue pertains to the following part of the redirect examination by the State of the witness Leon Addison:
 "Q. And, since Ms. Perry asked the question about all of the stealing that was going on between you and Angelo, is there anybody else in this courtroom doing any stealing?
"MS. PERRY: Judge, I'm going to object to that.
 "MR. COPELAND: She opened the door to it, if Your Honor please.
"THE COURT: Overruled.
"MS. PERRY: Judge, may we approach the bench?
 "MR. COPELAND: She can't have her cake and eat it too.
"THE COURT: Overruled.
 "MS. PERRY: I'm not trying to have my cake and eat it too. I want to approach the bench.
 "THE COURT: Go ahead and approach the bench, but I've already ruled.
"Bench conference as follows:
 "MS. PERRY: Your Honor, he's getting into something that's prejudicial.
"THE COURT: You opened the door. Overruled. Let's go.
"MS. PERRY: Judge, I did not open the door —
 "THE COURT: The record will reflect what happened, now let's go.
"MS. PERRY: Okay.
 "MR. COPELAND: Anybody else in this courtroom that was doing that stealing?
"A. Yes.
"Q. Who?
"A. Larry Singletary.
 "Q. Anybody else in this courtroom that was drinking and doing dope with you?
"A. Larry Singletary.
"MS. PERRY: I renew my objection, Your Honor.
"THE COURT: Overruled."
During the cross-examination of the particular witness, questions were asked him and answers given as follows:
"Q. And did you run around with Angelo?
"A. Yes, I did.
 "Q. Okay. Was he one of your best friends? He was one of the people you hung around, is that correct?
"A. Yes, yes.
 "Q. Okay. In fact, you and Angelo used to steal things together, didn't ya'll?
 "MR. COPELAND: Now, if the Court, please, that's — I'm — I'm — well, if you want to open the door to that, I'm going to walk through it.
"MS. PERRY: Judge, may we have a side bar?
 "THE COURT: No, let's go. You may ask him whatever you wish to ask him.
 "MS. PERRY: Okay, did you and Angelo have some business association of a sort?
"A. If you want to call stealing that, yes, yes.
 "Q. Okay. And, how long were ya'll associated in that way?
"A. Not long. *Page 566 
"Q. Okay. Is that how you met him?
"A. I don't remember.
"Q. You don't remember how you met Angelo?
"A. No, I don't.
"Q. It was a long time ago, wasn't it?
"A. Yes, it was.
 "Q. Now, did you also drink pretty heavily with Angelo, and you and Angelo used to use drugs together, right?
"A. Yes, we used drugs, and we drank a lot, yet.
 "Q. So, you were a pretty heavy drinker and drug user at the time, correct?
"A. No. No, we did not do it all the time.
"Q. Not all the time?
"A. Right.
"Q. But more than once, certainly, is that correct?
"A. Yes, more than once."
The above-quoted excerpts from the testimony of Leon Addison on direct examination by the State and on cross or recross examination by defendant do not conclusively show that defendant opened the door for the questions by the State that constituted the basis for this part of appellant's argument as to his first issue. However, we are persuaded that when the quoted material is taken into consideration in connection with all of the context thereof, including the fact that defendant was emphasizing in his cross-examination of Leon Addison that Leon Addison and Angelo Whatley had been habitually engaged in stealing, the State was justified, in view of the undisputed evidence as to the close relationship among those two and the defendant, in interrogating the witness as to whether the defendant had any connection with the stealing of the other two. We are not convinced that the trial court committed error prejudicial to defendant in permitting the State's inquiry on redirect examination of the Witness Leon Addison as to the question of participation by defendant in the unquestioned tangled web of criminal activity, including theft, of his associates Leon Addison and Angelo Whatley.
 II.
The gist of Issue II is to be found in the first paragraph of appellant's brief as to the issue, which is as follows:
 "During the trial below, the Court allowed a witness for the prosecution, Ms. Janet Dorch, to testify to completely hearsay evidence by Ms. Dorch's ex-husband, Angelo Whatley. Angelo Whatley, an alleged co-conspirator involved in the alleged murder, died in 1982 and was not present at the trial of Larry Singletary. Thus, Ms. Dorch was permitted by the trial court to testify to matters that Mr. Whatley told her approximately six years prior to the trial, (R.-108; — 203-06), inadmissible hearsay evidence was admitted against Appellant."
We have hereinabove quoted some of the testimony of Ms. Dorch that is referred to in the quoted paragraph of appellant's brief. If Ms. Dorch and Angelo Whatley were the only persons present at the time the statements were made by Whatley, appellant would have good ground for contending that the court committed error prejudicial to him in admitting such testimony in evidence. However, there was another person present at the time, the defendant himself. To show clearly the presence of the defendant at the time of the statement made by Angelo Whatley to Ms. Dorch, we quote extensively from the testimony of Ms. Dorch as follows:
 "Q. And, did you have occasion in 1976 when Angelo and Larry Singletary were present when they discussed a crime they committed?
"A. Yes.
"Q. Where did that conversation take place?
 "A. It was at my house in the dining room. We were sitting around the table. "Q. Who all was there?
"A. Me, and Angelo, and Larry.
 "Q. And, about — maybe the best way to ask you what time this was made is to ask you how long after you were married to him, approximately, did the conversation take place? *Page 567 
"A. Six or eight months.
 "Q. Now, what did Angelo Whatley say to you in Mr. Singletary's presence —
"MS. PERRY: Judge, I'll object —
"THE COURT: Overruled.
"MS. PERRY: — to hearsay.
"THE COURT: It's not hearsay, overruled.
"MS. PERRY: He's not in court.
 "WITNESS: Angelo told me that he and Larry and Leon went to Mobile and killed a man, Mr. Fleming.
 "Q. Mr. Fleming. And, did he tell you how they got there or anything like that?
 "A. Yeah, they drove Angelo's car and left Valdosta one night and came back the same night.
"Q. Did he say where they went?
"A. To Mr. Fleming's apartment or — in Mobile.
"Q. Did he say how they got in?
"A. They had a key.
 "Q. Did he tell you how they came to go down there, what the reason was?
"A. Uh — his wife had hired them to kill him.
"Q. Who is his. wife?
"A. Kay Fleming.
"Q. Did he tell you how the man was killed?
"A. They stabbed him, choked him, and stabbed him.
 "Q. Did he tell you who participated in the actual killing?
"A. I believe it was Angelo and Larry.
 "Q. And, was any — while all this was going on, what did Larry Singletary do?
"A. While Angelo was telling me you mean?
"Q. Yes, ma'am.
 "A. Well, he sat there and watched me to see how I was going to react —
 "MS. PERRY: Judge, I'll object to the reasoning? [sic, but which we deem should have been a period and not a question mark].
"THE COURT: Overruled.
 "MR. COPELAND: Now, did they have any discussion about how they were going to get paid?
 "A. Kay was going to give them insurance money that she had a life insurance policy out on her husband, and she was going to give them a — Angelo said $8,000.00 a piece.
 "Q. All right. And did they have any discussion at that time about Kay Fleming?
"A. Um —
"Q. And about her whereabouts?
 "A. Yeah, she had left town by the time they, you know, that I heard about it, that they told me — Angelo told me. She was gone, and they were going to find her.
"Q. Did they say why they were going to find her?
"A. Cause she hadn't given them any money.
"Q. Hadn't given them the money?
"A. (No audible response.)
"Q. To your knowledge, did Angelo ever get paid?
"A. No.
 "Q. Now, when did you come forward with this information?
"A. A couple of weeks after Angelo was killed.
"Q. And, do you know how he was killed?
"A. He was in a car accident, a head-on collision.
"Q. This was after your divorce?
"A. Yes.
 "Q. And, why did you — who did you come forward to tell and talk to?
"A. The police —
"Q. In —
"A. — Valdosta.
"Q. Why did you wait until Angelo was dead?
 "MS. PERRY: Judge, I'll object to self-serving statements.
"THE COURT: Sustained."
We regret that we are unable to determine from the transcript with absolute certainty whether defendant participated verbally in the conversation between Angelo Whatley and Ms. Dorch; some of Ms. Dorch's testimony *Page 568 
indicates that defendant did expressly participate therein, and some indicates that he did not. It is clear that defendant was in a position to hear what Angelo Whatley said, that what Angelo stated consisted in a large part of statements that incriminated the defendant and that there was no denial thereof by defendant at the time. An answer to the question whether the particular testimony was admissible is to be found in a number of cases in which it was held that similar testimony was not subject to the objection that it was hearsay, which cases are fully considered and profoundly discussed by Judge McElroy in Gamble, McElroy's Alabama Evidence, §§ 193.01 and 195.03 (3d ed., 1977), as follows:
 "One of the primary exceptions to the hearsay rule is that an admission of a party is to be allowed in evidence despite the fact that it is spoken outside the courtroom. . . . One of the primary examples of the implied admission occurs in the application of the Tacit or Implied Admission Rule. This rule comes into play when the criminal defendant hears an accusatory statement but remains silent even though the circumstances are such that an ordinary man, in like position, would make a denial. Both the accusatory statement and the fact of remaining silent are admissible under the theory that the accused impliedly consents to the truth of the statement and, therefore, makes an implied admission of guilt.
 "This doctrine traditionally has been applied by the courts in a strict fashion and the following are those elements which, according to the decision, must be shown before the silence of the accused is admissible as an implied admission: (1) The accusatory statement must have clearly charged the accused with the commission of a crime.
 (2) The facts must warrant a finding that the accused heard the accusatory statement. (3) The facts must warrant a finding that the accused understood the accusatory statement. (4) The accused must have had a reasonable opportunity to deny the truth of the accusatory statement. (5) The nature of the statement must have been such that the accused would naturally have denied it. (6) The circumstances must have been such that the accused would naturally have denied the accusatory statement. (7) The accused must have either remained silent or made such a reply as to give rise to an inference that he recognized the accusatory statement to be correct." Ibi., § 193.01 (1).
 "If the elements of the tacit admission rule are met, the silence of the accused upon hearing a statement by his co-conspirator, charging him with complicity in the crime, may be admissible against the accused as his implied admission of the truth of the statement." Ibi., § 195.03 (11).
To hold that the testimony was admissible does not impinge upon the general principle that the incriminating statements of one confederate after the ends of the conspiracy have been accomplished are not admissible on the trial of another. InEaton v. State, 280 Ala. 659, 197 So.2d 761, 762 (1967), the two principles were distinguished by Justice Lawson as follows:
 "The incriminating acts or statements of one confederate after the ends of the conspiracy have been accomplished, and no longer exist, are not admissible against another in his absence and without his knowledge and consent. Dailey v. State, 233 Ala. 384, 171 So. 729. That rule was applied in Edwards v. State, supra, and a reversal of the judgment of the trial court necessarily followed.
 "We have no such situation here. The statements made by one of Eaton's confederates after the commission of the crime which tended to connect Eaton with the commission of the crime was shown to have been made in Eaton's presence and were undenied by Eaton. Such statements were admissible under the rule of tacit admissions. Burns v. State, 226 Ala. 117, 145 So. 436; Munson v. State, 250 Ala. 94, 33 So.2d 463." *Page 569 
The trial court was not in error in overruling defendant's objection to the question asked Ms. Dorch as to what Angelo Whatley said to her "in Mr. Singletary's presence."
 III.
By the third issue presented in appellant's brief, appellant contends that the trial court committed reversible error in failing to grant appellant's motion for a directed verdict of acquittal "on the basis of insufficiency of evidence presented by the State." Appellant correctly argues that a defendant cannot be convicted of a crime on the uncorroborated testimony of an accomplice and that Leon Addison was an accomplice in the murder in the first degree of Charles Wayne Fleming. However, in our opinion, the testimony of Leon Addison was corroborated by the direct and circumstantial evidence presented by the testimony of other witnesses, and thus met the requirements for a valid conviction of Code of Alabama 1975, § 12-21-222, in "tending to connect the defendant with the commission of the offense" and in not "merely" showing "the commission of the offense or the circumstances thereof." A case largely relied upon by appellant is Jacks v. State, 364 So.2d 397 (Ala.Cr.App. 1978), cert. denied, 364 So.2d 406 (Ala. 1978), which, in our opinion does not constitute support for appellant's contention. We come to a conclusion contrary to the contention of appellant by applying what was said in Jacks v. State, at 364 So.2d 405:
 "Additionally, sufficient corroboration of the testimony of an accomplice may be furnished by a tacit admission of the accused, by the suspicious conduct of the accused, and the association of the accused with the accomplice, or by the defendant's proximity and opportunity to commit the crime. Cheatwood v. State, 22 Ala. App. 165, 113 So. 482, cert. denied, 216 Ala. 692, 113 So. 915 (1927); 23 C.J.S. Criminal Law, § 812 (4)."
There is no merit in appellant's issue III.
 IV.
The fourth issue presented by appellant is thus captioned in the brief of his counsel:
 "APPELLANT WAS ENTITLED TO A DISMISSAL, CONTINUANCE, OR OTHER APPROPRIATE RELIEF AS A RESULT OF THE PROSECUTOR'S [SIC] NON-COMPLIANCE AND MISCONDUCT REGARDING THE TRIAL COURT'S PRETRIAL DISCOVERY ORDER DURING TRIAL."
Appellant's attorney proceeds to argue the issue in a single page consisting of three paragraphs, in which references are made to at least ten pages of the transcript. The argument concludes with the following paragraph:
 "Appellant further asserts that prosecutor wilfully failed to comply with the court's pretrial Order regarding discovery, and the court refused to enforce this order in a fair and impartial manner and that Appellant's preparation and presentation of his defense was very limited and impaired as a result. Since Appellant was denied appropriate relief below, he hereby urges this Honorable Court to reverse the conviction."
We have difficulty in determining with certainty what ruling, if any, by the trial court constitutes the target of appellant's fourth issue, but our review of the transcript fails to convince us that "prosecutor wilfully failed to comply with the court's pretrial Order regarding discovery" or that "the court refused to enforce" such an "order in a fair an impartial manner." We conclude, therefore, that appellant's issue IV is not well taken.
 V.
The fifth issue presented by appellant is captioned in the brief of his attorney as follows:
 "THE TRIAL COURT ABUSED ITS DISCRETION IN CERTAIN INSTANCES THROUGHOUT THE INSTANT CASE WHICH RESULTED IN THE DENIAL OF A FAIR TRIAL FOR APPELLANT." *Page 570 
Thereafter, in the brief of counsel for appellant, is found a miscellany of "several instances" that, according to appellant's brief, "happened in the trial below which the trial court permitted" to the "detriment of Appellant." We now consider each of said instances.
Appellant complains that the trial court "allowed more than one police officer — an Officer Crews of Valdosta, Georgia, — to be excused from the rule, thereby implicating to the jury that Appellant had much criminal activity going on. (R. — 13-14)." We now quote from pages 13 and 14 of the record:
 "MS. PERRY: Yes, sir. I'm going to object to — what's your name?
"OFFICER CREWS: Lee Crews.
 "MS. PERRY: Officer Crews from Georgia, his presence here I think it does have an adverse influence on my client, and it produces some sort of response that Larry Singletary has trouble going on in Georgia, and his presence at this table. First of all —
 "THE COURT: If that's a motion for me to exclude him and not have him under the — I mean than have him under the rule, the motion is denied.
 "MS. PERRY: I'm going to object to more than one person being excused from the rule.
 "THE COURT: Okay, you've objected, and I overrule it. Now, anything else?
 "MS. PERRY: Just about his presence being prejudicial —
"THE COURT: It's not prejudicial.
"MS. PERRY: — in front of the jury.
 "THE COURT: In the case, from the opening statement is all I know. He has every right in the world to have a detective from Georgia in the courtroom, and I've already granted it and it's done."
In our opinion, the court was well within the rightful exercise of its discretion in excusing Officer Crews from the rule. It is unfortunate that there is some overlapping of language by the trial judge upon what defendant's attorney was saying in the dialogue between them as shown above, but fortunately the jurors were not present at the time and no prejudice could have resulted from that circumstance.
Appellant next contends in furtherance of issue V: "As asserted in Section IV of the Argument, the trial court failed to order the State to timely produce, if at all, certain discoverable matters to which Appellant [was] entitled." This contention appears on its face to be repetitive of some contention made as to Issue IV and adds nothing to what appellant contended as to Issue IV, which we have already said herein "is not well taken."
Appellant states that the "trial court refused to allow defense counsel to fully question Officer John Wayne Boone about the relevant matter of the original suspect of the alleged murder, (R. — 220-21), as well as letting Sgt. Boone make serious self-serving statements. (R. — 226-27)." To clarify this double-barrel contention of appellant, we should quote from the cited portions of the transcript the target of appellant's contention, commencing with that which pertains to the first part of his contention. During the cross-examination by defendant's attorney of Sgt. Boone, the following occurred:
 "Q. Did you work at all on the case before 1970 — before 1982?
"A. No, ma'am, I didn't.
 "Q. Well, were you aware of the initial investigation that had been conducted in the case back in 1976?
 "A. Yes, ma'am, I know several things about the case that happened before I got into it.
"Q. Okay. And, you were aware that the State had —
 "MR. COPELAND: All right, wait a minute, now, we ask for a side bar up here.
"(Bench conference as follows:)
"THE COURT: Go ahead.
 "MR. COPELAND: Now, what she's fixing to ask, she's fixing to ask about the person that was arrested. There was a young lady that was arrested in 1976 who was released for insufficient evidence — *Page 571 
"MS. PERRY: Oh, she was.
 "MR. COPELAND: And that's inadmissible, she was released by the District Attorney's Office and Doug Wilson, insufficient evidence. That's inadmissible, she can't go into it.
 "THE COURT: How do I know that's what she was going into?
 "MR. COPELAND: Well, I'm going to ask Your Honor right now to tell her not to go into it.
 "THE COURT: Well, that doesn't have anything to do with it, I'll go along with that. What was — what were you going to ask him?
 "MS. PERRY: I was going to ask him if they had ever cause to arrest someone other than Larry Singletary.
"MR. COPELAND: Same thing, no way.
"THE COURT: No.
"MS. PERRY: We except, Your Honor.
"THE COURT: What?
 "MS. PERRY: Your Honor, we are offering it to show a reason (inaudible).
"THE COURT: No. I sustain the objection.
"MS. PERRY: Thank you.
". . . .
 "MS. PERRY: Were you aware of the lipstick stains that were found on the deceased's body?
"A. I read —
"Q. On the clothes?
"A. — I read a lab report indicating that, yes.
"Q. Okay.
 "MR. COPELAND: Now, if the court, please, I think on his body is a mistatement. I think we are talking about the underpants like Dr. Wert testified to.
"MS. PERRY: On the underclothes?
"A. I thought that's what you said, the underclothes.
 "Q. Okay. And, you are aware that fingerprints of the scene had been taken, were you not, Sergeant Boone?
 "A. The scene had been processed for fingerprints, yes, ma'am.
 "Q. Okay. But, you have no fingerprints that were identified as those of Larry Singletary?
"A. No, ma'am.
 "MR. COPELAND: Now, if the Court, please, that may imply that a comparison was made, and —
"MS. PERRY: Your Honor, I'll object to —
 "THE COURT: You have a right to ask him on cross whatever you wish to ask him.
"MR. COPELAND: I'll take it up at the proper time.
"THE COURT: I wish you would. Now, let's move on."
We have quoted approximately all of the cited pages of the record, pp. 220-21, in which defendant's counsel questioned Officer Boone. We find much of it unclear and somewhat confusing as to what defendant's counsel proposed to show by the witness, what State's counsel thought was objectionable in what defendant's counsel proposed to show by the witness, and what the court determined or considered objectionable in what defendant's counsel proposed to show by the witness, and what the court determined or considered objectionable in what defendant's counsel proposed to show by the witness. We are of the opinion that, although there is enough in the matter now under consideration to excite wonder and pique curiosity, the record does not support any contention by appellant that the trial court committed error prejudicial to defendant by refusing "to allow defense counsel to fully question" Officer Boone as to any "relevant matter" involved in the fact that soon after the murder of Mr. Fleming a female, not the victim's wife, was suspected of participating in the murder of Mr. Fleming.
By appellant's contention that Sgt. Boone made "serious self-serving statements" while testifying, appellant apparently challenges the ruling of the trial court during the following portion of the State's cross-examination of Sgt. Boone:
 "Q. All right, sir. And, when you were asking Mr. Singletary questions, by the *Page 572 
way, when you were asking him questions, what was your purpose in talking to him?
 "MS. PERRY: Judge, I'll object to self-serving statements.
"THE COURT: Re-state your question.
 "MR. COPELAND: What was your purpose in interrogating Larry Singletary over here and back in Georgia? Are you waiting?
"THE COURT: Go ahead, you may answer it.
 "THE WITNESS: Yes, sir. My purpose in interrogating him was to gain knowledge of this crime, to gain evidence to do my job, investigate this case.
 "Q. And, your purpose was not to tell him what evidence we had against him, was it?
"A. No, sir.
 "MS. PERRY: Judge, I'll object to him leading the witness —
"MR. COPELAND: It's cross-examination.
"MS. PERRY: — and all these self-serving questions."
Without approving any particular question or the answer thereto of the witness, we are unable to conclude therefrom that there was any error prejudicial to defendant in any ruling adverse to defendant as to the matter.
Appellant contends that the trial court "allowed State's witnesses to testify regarding alleged confessions made by appellant without introduction of proper predicate or foundation by the state. (R.-111; 117)." The references are to portions of the record during the testimony of Ms. Dorch and Russell Wells respectively. As shown hereinabove, both witnesses were testifying as to conversations with or in the presence of defendant in 1976, long before defendant was ever under investigation or in custody as a suspect. The circumstances were such that whatever confessions or admissions are to be found in what he said or did at the time were entirely voluntary. There is no contention to the contrary.
Appellant also complains that the trial court "allowed the prosecutor to continually interrupt defense counsel during the course of the trial at certain critical points on direct and cross-examination of the witnesses, thus prejudicing and interfering with the defense; similarly the court made several biased remarks in the presence of the jurors and trial witnesses against Appellant." Appellant cites no specific instances of such behavior on the part of the prosecuting attorney or on the part of the trial judge. Without particularizing any interruptions by counsel for the State or "bias remarks in the presence of the jurors and trial witnesses," appellant does not present any issue for us to decide in connection with this contention of appellant.
It is further contended by appellant that the court "allowed members of the jury to associate with and converse with various of the State's witnesses out in the hall while in-court hearings were being held outside the presence of the jury." Appellant's failure to specify or in any way bring to our attention any occasion on which the conduct occurred precludes us from determining whether there is any validity to appellant's complaint in this respect.
Appellant charges that the trial court "erred in not granting a mistrial in favor of appellant, nor did it fully admonish the prosecutor or instruct the jury regarding the following remark made" by the prosecuting attorney in closing argument:
 "MR. COPELAND: Next week, as we all know, is Thanksgiving. And, Thanksgiving, I think, more than any other day in America, even more than Christmas, is a time for families to get together, and if we can't be with our loved ones and our families, we call them long distance. Well, with the Fleming family next week, there's going to be an empty chair for Thanksgiving. . . ."
Immediately thereafter is the following:
 "MS. PERRY: Judge, I'll object to trying to get a verdict based on sympathy.
"THE COURT: Sustained." *Page 573 
We agree with the trial judge and with defendant's counsel as to what they said at the time as to the argument. We do not agree, however, with appellant that the court "erred in not granting a mistrial in favor of appellant" or in not fully admonishing "the prosecutor or instructing the jury regarding the . . . remark." It would not have been proper for the court to grant a mistrial in the absence of any motion or request therefor by defendant. The trial court was not in error in failing to "admonish the prosecutor or instruct the jury" as to the matter, in the absence of any request therefor by defendant.
 VI.
By this issue, appellant says that the "trial court improperly commented upon the evidence presented in the presence of the jury." In purported support of the issue, a large number of extracts from the transcript are quoted in the brief of appellant's counsel. We think it inappropriate and unnecessary to set forth herein all of them, but we will do so as to the first one, which is somewhat typical of the others. It is found during the cross-examination by defendant's attorney of the only eyewitness to the murder, Leon Addison, from whose testimony we have quoted profusely hereinabove. We now quote from the pages of the record cited in appellant's brief at the commencement of the argument as to Issue VI.
 "Q. How many times have you and Aletha [Aletha Addison, the wife of the witness] separated?
"A. Oh, it's twice I think, if I'm not mistaken.
"Q. Are you sure?
"A. Not more than three.
"Q. Not more than three?
"A. Right.
"Q. And this is over a period of around twelve years?
"A. Twelve years, yes.
 "Q. Okay. Now, the first time you separated, do you know when it was, how long you had been married?
"A. Seven or eight years.
"Q. Okay. And you had lied to Aletha, hadn't you?
 "MR. COPELAND: Judge, I hate to interrupt her, but what does that have to do with this proceeding? I don't see any relevance at all. We object.
 "THE COURT: I don't either, but I'm going to let her ask.
 "MS. PERRY: All right. You had lied to Aletha several times hadn't you?
"A. Yes.
". . . .
 "Q. All right. Can you put a number on the times you have lied to Aletha?
 "MR. COPELAND: Judge, I hate to interrupt her again, but we're not trying — if we were going to try me for lying to my wife, I'd be in Holman right now. You know, that's just not — that's not relevant.
"MS. PERRY: Judge —
"THE COURT: Go ahead. You may ask.
 "MS. PERRY: Can you put a number on the times you've lied to your wife?
"A. No, I can't.
 "Q. All right, but you've been married to her for twelve years?
"A. Right.
 "Q. You've also beaten her several times, is that correct?
"A. We've had several fights, yes.
 "Q. Okay. And, that's been another cause of your separation, is that correct?
"A. Yes, it is.
 "Q. And you have also hurt her in many, many ways, is that correct?
 "THE COURT: Now, Linda, I've let you ask everything under the sun. For impeachment purposes, you can ask him anything you want, you know, let's don't try his marital relations, please.
 "MS. PERRY: No, Judge, I'm just offering it to show impeachment.
"THE COURT: Well, let's stick to that.
". . . .
 "Q. Okay. You say that during your marriage you've been separated more than you've been together?
"A. No — *Page 574 
 "MR. COPELAND: Judge, I hate to interrupt her one more time, but, you know, we've been trying here — seems like we are trying a divorce case instead of a murder case. I —
"THE COURT: That's you know, I — I I've let —
"MS. PERRY: Judge, it's all relevant —
 "THE COURT: — You ask everything under the sun, but how many days he and his wife stayed together doesn't have a thing to do with this case.
 "MS. PERRY: I understand that, Judge. It's relevant to show impeachment.
 "THE COURT: Well, I just got through ruling it wasn't, so now you stick to any impeachment you want, but I'm — tired of hearing about his married life.
"MS. PERRY: Thank you.
"WITNESS: Thank you.
 "MS. PERRY: What do you do for a living now, Mr. Addison?
"A. I'm an ironworker."
Appellant under Issue VI complains of additional unnecessarily disputatious wrangling between the opposing trial attorneys into which the trial judge injected himself with some apparent impatience. All of this was somewhat indecorous, but in none of it can we place all the blame upon the trial judge for the hassle. In our opinion, no error prejudicial to defendant was committed in any of the incidents forming the basis for Issue VI.[1]
 VII.
Under VII of appellant's brief, appellant urges that "the trial court committed reversible error in its oral charge to the jury." Appellant further says that in "its oral charge to the jury, the trial court erred in four major ways, thus prejudicing appellant's rights" and then proceeds to discuss the "four major ways" by four separate subdivisions, numbered 1, 2, 3 and 4. We consider them in the same order as presented in appellant's brief:
1. At the conclusion of the court's oral charge and while the jury was in the jury room awaiting word from the court that it could commence its deliberations, the trial court asked the defendant's attorney to make known to it any exceptions, and the following then occurred:
 "MS. PERRY: I state my exception to the charge on confession — on confessions as being some of the most reliable and trustworthy evidence there is. I would ask that you instruct the judge — that you instruct the jury as to the possibility of confessions also being taken under very unreliable circumstances and being very unreliable based upon who they are made to."
It appears that the exception was directed at the following portion of the oral charge:
 "Now, ladies and gentlemen of the jury, in this case, the State of Alabama has offered what purports to be a confession and/or admission or statements against the interest by the Defendant relative to the offense here charged against him. The law in this respect is simply that all confessions and/or statements against interest are presumed to be unvoluntary [sic], unless they are shown to have been voluntarily made. That is, that the confession and/or statement against interest was made by the Defendant freely and voluntarily and without any threats, or fear, or the offer or hope of reward or otherwise, and the burden is first upon the court to determine such questions for the purpose of admitting or refusing its admission into evidence in the case for the jury's consideration. In this connection, again, the burden is on the State to satisfy the jury beyond a reasonable doubt that the confession and/or statement against interest of the Defendant was a voluntary statement and given by him without fear of punishment or hope *Page 575 
of reward on the part of those who had him in custody or whatever at the time the statements were made. And, the alleged confessions and/or statements against interest of the Defendant again, as you know, have been allowed into evidence by the Court, and the same is before you as a part of the evidence in this case. However, I would tell you, the jury is not bound by the alleged confessions and/or statements against interest made by the Defendant, though I would tell you that confessions of guilt or statements against interest, when freely and deliberately made are among the most effectual and satisfactory proofs that can be received in courts of justice. And, although the court has allowed the confessions or statements against interest to come into evidence for whatever you, the jury, determined to be its truth. It is for you, nevertheless, to be satisfied that it was obtained lawfully. That is, if it was not obtained lawfully or by wrongful means, such as threats, or fears of punishment, or hope of reward, or anything like that then you, as the sole triers of the facts in this case have a right to totally disregard such a confession or statement against interest, and in such event, you would then look to all the other evidence in this case to see if there was any sufficient evidence apart from the confessions and/or statements against interest whereby you are convinced beyond a reasonable doubt of the guilt of the Defendant, because it must be from the evidence believed by you that established the guilt of the Defendant beyond a reasonable doubt before you can convict him."
There is some merit, we think, in the exception taken by defense counsel as to that part of the court's oral charge in which he said "that confessions of guilt or statements against interest, when freely and deliberately made are among the most effectual and satisfactory proofs that can be received in courts of justice," but upon consideration of the full context of the statement, we are convinced that it was not substantially harmful to defendant. Whatever tendency there was unfavorable to the defendant as to evidence of confessions or admissions was offset by what the court said favorable to defendant on the subject.
2. Appellant next complains of the following part of the court's oral charge:
 ". . . If you believe, however, that any witness has wilfully sworn falsely to a material fact, you may, if you wish, disregard that person's entire testimony . . . in weighing the testimony of the witnesses, you may consider many things: The demeanor of the witness on the stand and that simply means how they answer the questions; his or her ability to see or know the facts about which he or she has testified; the relationship that he or she bears to the party; their interest in the suit, if any; the manner in which the witness may be affected by the verdict; and, of course, any bias or prejudice which any witness may possibly possess . . ."
The transcript shows that no objection was made or exception taken to the portion of the court's oral charge just quoted. Defendant's failure to reserve any exception or make known any objection to the particular portion of the court's oral charge precludes him from raising the point for the first time on appeal. Van Antwerp v. State, 358 So.2d 782 (Ala.Cr.App. 1978), cert. denied, 358 So.2d 791 (Ala. 1978)
3. Appellant seeks to base a reversal upon the refusal of the trial court to give defendant's requested written charge No. 12, which was as follows:
 "I charge, you members of the jury, that the verdict you reach must be unanimous, and if any juror has any reasonable doubt of the defendant's guilt arising from the evidence, a part of the evidence, or lack of evidence, then the defendant cannot be convicted."
Appellee responds by asserting and convincing us that defendant's counsel did not reserve an exception or make an objection to the court's refusal of the written charge and relies upon the principle set forth in *Page 576 Allen v. State, 414 So.2d 989, (Ala.Crim.App. 1981), aff'd.414 So.2d 993 (Ala. 1982), and subsequent cases that the automatic exception rule as to the giving or refusal of a written charge that had previously prevailed in Alabama ceased to exist with the adoption of Rule 14, Alabama Rules of Criminal Procedure, effective July 16, 1982, which provides, in pertinent part:
 "No party may assign as error the court's giving or failing to give a written instruction. . . . unless he objects thereto before the jury retires to consider its verdict, stating the matter to which he objects and the grounds of his objection."
4. The first paragraph of this contention in appellant's brief is:
 "The trial court erred in refusing to instruct the jury regarding character evidence improperly adduced by the State at trial against Appellant. Since the evidence brought out by the State of Alabama was so detrimental and prejudicial toward Appellant, constituted plain error for the trial [sic, but we consider the contention as if the word `court' or `judge' were inserted] failed to instruct the jury as to character evidence generally. See Ashlock v. State, 367 So.2d 560 (Ala. 1978)."
The citation of Ashlock v. State, 367 So.2d 560 (Ala.Crim.App. 1978), cert. denied 367 So.2d 562 (Ala. 1979), convinces us that appellant is referring in this part of the brief of his counsel to the failure of the trial court to charge the jury as to the unquestionably bad character of some of the witnesses for the State, particularly one of the three men who murdered Mr. Fleming, Leon Addison. Ashlock is clearly distinguishable from the instant case in that in Ashlock the error of the trial court that required a reversal of the case was in the refusal by the trial court of a charge requested in writing by defendant setting forth the principle urged by appellant as to the significance or value of character evidence, which defendant did not present to the trial court by a requested written charge or otherwise. This contention of appellant is not well taken.
 CONCLUSION
We regret the inordinate length of this opinion, which the writer feels was necessary in order to permit adequate consideration of the numerous ramifications of the questions presented in the briefs of the parties on appeal. Our consideration thereof leads to the conclusion that no error prejudicial to defendant was committed by the trial court and that the judgment appealed from should be affirmed.
The foregoing opinion was prepared by Retired Circuit Judge LEIGH M. CLARK, serving as a judge of this Court under the provisions of § 6.10 of the Judicial Article (Constitutional Amendment No. 328); his opinion is hereby adopted as that of the Court.
AFFIRMED.
All Judges concur.
[1] In appellant's brief, we find the apparent implication that at the conclusion of the court's oral charge the trial court, in the presence of the jury, commented unfavorably to the defense as to some exceptions by defendant's counsel as to the court's oral charge. However, the transcript shows clearly that the exceptions were taken after the following entry in the court reporter's transcript: "(Jury retires to jury room at approximately 1:55 P.M.)."